James **HUFFMAN** and **Evelyn Nelson**
**HUFFMAN**, Appellants,

v.

**UNITED STATES** of America,
Appellee.

No. 18723.

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1962.

Rehearing Denied March 13, 1962.

Murray L. Williams, Water Valley, Miss., Sam Lumpkin, Tupelo, Miss., for appellants.

Alfred E. Moreton, III, Asst. U. S. Atty., Thomas R. Ethridge, B. Euple Dozier, U. S. Attys., Oxford, Miss., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

Appellant James Huffman and his wife Evelyn Nelson Huffman were convicted of possessing untaxpaid liquor in violation of Title 26 U.S.Code §§ 5205(a) (2) and 5604(a) (1) and were sentenced to fine and imprisonment. They were indicted in an eight count indictment and were found not guilty under six of the eight counts.

Count one was a conspiracy count charging that the appellants had conspired with James and V. O. Bridges to commit various violations of the Internal Revenue Laws, specifying thirteen overt acts. The second count charged the appellants and the Bridges with possession and control of an unregistered still contrary to §§ 5179(a) and 5601(a) (1) of Title 26 U.S.C. The remaining six counts charged the Huffmans (and in count three the Bridges) with illegal possession of whiskey in amounts varying from 1½ pints to 6,132 gallons, in containers not having stamps affixed. The total quantity charged in these six counts to have been possessed was 7,257 gallons, 1½ pints. The appellants were convicted by the jury of the possession of 1½ pints, as charged in count five, and of 110 gallons as charged in count seven. They were acquitted of the charges of conspiracy, of possessing the still and of possessing a total of 7,147 gallons of whiskey as set forth in the remaining counts. V. O. Bridges, during the trial, entered a plea of guilty to count two, possession of the still, and count three, possession of 309 gallons of whiskey.

Appellants contend that their motion for directed verdict should have been granted on the ground that there was insufficient evidence to sustain the jury's findings against them on counts three and seven. A careful reading of the record convinces us that the proof against Eve-

lyn Nelson Huffman was not sufficient to support the verdict as against her and that the motion for directed verdict should have been granted. No good purpose will be served by detailing the evidence.

A receptacle containing one and one-half pints of whiskey was found in a locked outhouse adjacent to the dwelling occupied by Evelyn and James Huffman. The title to this property was in the son of James Huffman who lived in a distant city. Huffman gave permission for the search of the outhouse, and when the whiskey was found he claimed it as his own, stating that he was keeping that as "a little drinking whiskey."

As to the 110 gallons covered by count seven, the evidence was not strong, but was, in our opinion, sufficient to warrant submission of this count to the jury. This whiskey was found by agents of the Alcohol Tax Unit in two charred barrels at a hay house about one-half mile south of the Huffman's residence. That, too, was on land standing in the son's name. The transfer of this property to the son had taken place when he was quite young and several years before the whiskey was found. The action had been taken in connection with domestic trouble which was threatened between James and Evelyn Huffman.

Evelyn Huffman claimed to be the owner of the hay in the house where the 110 gallons were found, but disclaimed any knowledge of the presence of the whiskey. She had testified that her husband's business was collaborating with her in the growing of pastures, the raising of cattle, and selling them on the market. The jury was warranted in believing that James Huffman had actual possession of the field in which this hay house was located and, with his wife, owned the hay in it.

It was shown that, during the spring and early summer of 1959, James Huffman had purchased from the operator of a feed and seed store in Grenada, Mississippi nearly 4,000 pounds of Balboa Rye grain. Huffman was accustomed to call in his truck and purchase the grain in 100 pound bags, paying cash for it. The largest delivery was eight or nine bags in June or July, 1959. This grain was suitable for use in the manufacture of whiskey. One of the representatives of the County Agent's office testified that this grain was not generally planted in that section of the State, and he had never known of any plantings except a few in small quantities for experimental purposes. Some of the empty rye sacks were found in the garage at the Huffman home. From these facts and circumstances, we think a judgment of conviction on count seven is supported by substantial evidence.

█ Appellant James Huffman argues that the court below committed error in giving the jury a supplementary charge when, after more than four hours of deliberation, it was called back to the courtroom and had advised the court of its inability to agree upon a verdict. No exception was taken to the charge, and we do not agree with the appellant that the giving of it constituted plain error under Rule 52, Federal Rules of Criminal Procedure, 18 U.S.C.A. Cf. Allen v. United States, 1896, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528; Powell v. United States, No. 19030, 5 Cir., 1961, 297 F.2d 318; Cook v. United States, 5 Cir., 1958, 254 F.2d 871; Butler v. United States, 5 Cir., 1958, 254 F.2d 875.

We have carefully considered the other errors assigned by appellant James Huffman and do not find any of them possessed of merit.

As to appellant James Huffman, the judgment of the court below is affirmed; as to the appellant Evelyn Nelson Huffman, the judgment is reversed and judgment rendered here in her favor.

Affirmed in part and in part reversed and rendered.

JOHN R. BROWN, Circuit Judge (concurring as to Appellant Evelyn Nelson Huffman and dissenting as to Appellant James Huffman).

Coming as it does on the heels of Powell v. United States, 5 Cir., 1961, 297 F.2d 318 [No. 19030, December 8, 1961], from a panel having two of the same Judges as this one and through a single spokesman, it is difficult for me to see how we can justify the dynamite charge used here. Considering the fact that the harm, if it is harm, cannot actually be eradicated by an ostensible withdrawal or supplemental instruction, the apparent distinction that in Powell an exception was registered by the accused while here, after an expressed acquiescence in the trial court, it is urged as a matter of plain error is an inconsequential basis for declaring one trial to have been unfair, the other one fair. If there ever were a place for the plain error rule of F.R.Crim.P. 52, this should be it. This is the Judge speaking. He is speaking not on the substantive merits of the case. He is speaking about developments subsequent to submission of the cause. He alone has determined that the time has come for an admonition to the jury. When it is done, it is too late to undo it. Nothing, absolutely nothing, he may say can really correct this if (a) the time was inopportune or (b) the content or method of supplemental instruction is significantly faulty. Consequently, this ought to be viewed just as though counsel, instead of acquiescing, had gone through the formality of excepting.

When approached in this fashion, the charge as here given reveals that the Judge was subjecting this jury to pressures and coercion of a kind never for a moment sanctioned by the Allen charge. Indeed, the departure from Allen is so marked that whatever limited use ought ever to be allowed or made of it when carefully circumscribed must be forfeited by the misguided offhand elaborations of it as here declared. The objectionable features are highlighted by inserting the bracketed numbers [1] through [13]. It is significant that only part [9] is an accurate paraphrase of the Allen charge as pronounced in 1896 in Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528. The jury first retired about 1:20 p. m. At 5:40 p. m. the Court called the jury back to the courtroom. When, in response to the Court's question the foreman advised the Court that the jury had been unable to arrive at a verdict with respect to any of the defendants on any of the counts, the following supplementary charge was given by the Judge:

"I can understand partly how twelve people can often see things from different viewpoints, [1] but you must remember that Courts and juries exist for the purpose of deciding questions and settling lawsuits.

[2] "It means a great deal to the parties in interest in this case,—the prosecutors, the defendants,—for a verdict to be returned.

[3] "There is no reason for any of you to suppose that it would be any easier for another jury to reach a verdict. This now is substantially the third day we have been involved in trying this case. You have been here away from your usual activities, listening to the evidence, listening to my instructions, and listening to the arguments of the lawyers.

[4] "In addition to the inconvenience caused to you, your presence here and the presence of the Court officials has been a substantial expense to the Government. [5] All of these Court officials, including me, are here at Government expense.

[6] "To say it another way, the taxpayers are making a substantial contribution to the operation of this Court in the trial of this case.

[7] "Then, too, these lawyers who are engaged in the trial of this case have other obligations to other clients,—other engagements they must meet.

[8] "Unless you can decide this case, it means all of this will have to be gone over again; that everyone involved except you twelve men sit-

ting in the box as jurors, who would be disqualified,—it means everyone else involved will have to go over this same long road again.

[9] "It is your duty, as I told you generally in my instructions before you retired, to consider your verdict, to discuss the case among yourselves and listen to the views of the other jurors.

"I do not suggest that any one of you should surrender a position that you conscientiously hold, but I do think it would be better for you to consult some more with each other, reexamine your own viewpoint, your own position, in the light of the position of the other jurors, and in the light of the arguments advanced by them for their position. Listen to each other, [consult with each other] to see if it is not within the realm of reason that you may be able to reach a verdict.

"It is the duty of the majority of you who hold one view to listen to the minority who hold, perhaps, an opposite view.

"And it is the duty of the minority to listen to the views of those who hold the opposite view to them, so that all of you together may reexamine the position you have taken in the view you have now, to see if, in the light of the arguments advanced by the other side, you may not be able to reach an agreement.

"You should, of course, as you listen to arguments advanced by the opposite side in the re-examination of your own view and your own opinion, you should not hesitate to change that position or that view if you became convinced that the view you presently hold is wrong or in error.

[10] "I very often try cases without a jury, in which I not only have to pass on questions of law as I have done in this case, but I have to also decide the facts.

[11] "I say, frankly, I very often have difficulty in arriving at a disposition in determining which side rightfully should prevail. But I know sooner or later I have to make the decision. There is no way for me to escape it.

[12] "The only way you can escape it is to shift your responsibility to twelve other jurors sitting in the box for another trial of this case at another time.

"If there is anything I can say or do that can be of assistance to you in arriving at a verdict, I hope you will let me know.

[13] "But you should bear these other considerations in mind as to desirability of reaching a unanimous verdict so that other litigants can have their cases without the Court having to give time and attention to the retrial of this case, and so that all these other people who are involved may not have to come back here and travel this road again.

"The Marshal will take you to the evening meal when you are ready for it. But now I am going to ask you to go back to the Jury Room and consider this case further."

A skeletonized listing of these parts vividly reveals the extrinsic, irrelevant factors compelling, in the Judge's mind, a decision then and there:

[1] duty to decide and settle
[2] means much to parties
[3] will not be easier for others
[4]. expense to Government
[5] inconvenience to Judge and others
[6] cost to taxpayers
[7] keeps lawyers from other work
[8] all must be done over
[10] as Judge must courageously decide facts, so must jury
[11] frequent difficult, but no way to escape
[12] only escape is to shift responsibility

[13]   make room for other litigants

A consideration of this charge demonstrates that the Judge was laboring under a basic misapprehension: that a criminal trial must end with (1) a verdict of guilty or (2) a verdict of not guilty. What he overlooked was that failure to agree at this trial is, at least momentarily, a victory for the defense and a legitimate end of the trial.

The basic misconception was then translated into a positive error. The Court did more than charge the jury that each had a duty carefully to consider opposing views. He charged affirmatively that it had a duty to *decide*. This was brought home in the most dramatic, emotionally packed terms. Likening their difficulty to his own travail as a factfinder he said, "There is no way for me to escape it," the "It" being "to make the decision" (part [11]). This was followed immediately by the words: "The only way you can escape it is to shift your responsibility to twelve other jurors sitting in the box for another trial of this case at another time" (part [12]).

Escape has itself cowardly connotations implying that jurors were running from duty. That this was the meaning intended is shown by the phrase "shift your responsibility."

The Court then proceeded to dramatize why it was important that the jury perform this "duty to decide" then and there without delay. Nearly each of these reasons was an appeal to matters extrinsic to the sole object of their being in the jury room. First, enough time had already been spent in the 3-day trial (part [3]). Further inconvenience to jurors, parties, witnesses, lawyers, etc. should be avoided especially because of the "substantial expense to the Government" (part [4]), since "All of these Court officials, including me, are here at Government expense" (part [5]). Emphasis upon the cost of further delay was made by repeating in "another way" that "the taxpayers are making a substantial contribution to the operation of this Court in the trial of this case" (part [6]).

Unless the jury comes to agreement now other litigants will not be able to get their cases tried (part [13]) and the lawyers will be unable to attend to the affairs of other clients (part [7]). If decision is not made now, "it means everyone else involved will have to go over this same long road again" (part [8] and [13]). Finally, since a Judge frequently has to make difficult decisions, the jury can do the same (part [11]).

One pertinent aspect of the last "reason" was not made clear by the Judge to the jury: while it truly falls the lot of a Judge to decide difficult questions under trying circumstances, the struggle is a personal one involving no one but himself. The Judge, the Court, the man are one at this point. But with a jury it is quite a different matter—the composite judgment of a dozen. More than that, when the Judge fails to find "beyond a reasonable doubt" that the defendant is guilty, he knows that the law compels a finding of not guilty. His verdict of "not guilty" is then the equivalent of a Scotch verdict of "not proven," and that is the inevitable meaning, so far as the particular jury is concerned, of its inability to agree. That is so because it is, in effect, a declaration that "we of this jury—as a body of twelve men—are unable to find beyond a reasonable doubt that the defendant is guilty."

This jury was subjected to appeals and pressures which had nothing to do with innocence or guilt of the defendant on trial. A conscientious citizen serving as a juror wants earnestly to do his duty. He is impressed, as he should be, by the awesome power and prestige of a United States Judge. In performing his role in the pursuit of justice, the juror wants to feel that he is as loyal, as conscientious, as fearless, as courageous and as objective as the Judge. He wants to be a good citizen. He desires, for at least this one time in his life, to measure up to what he senses and feels in the atmosphere of the courtroom. He is told by the Judge that it is wasteful of the Judge's time, the taxpayers' money, and

interferes with the right of others to secure trial and the services of attorneys if the case must be retried. He is told that a decision must be made and that it might as well be made now.

This is not a free jury. Done with more finesse and sophistication, the practical effect of the charge is the same as the now historically discredited coercive power of the Judge over the jury when its verdict displeased the Judge. The strength of the jury system is its absolute, real, actual independence. It must take its instruction on the law from the Judge, but the jury alone determines the facts. It is simply not legally correct that some jury must sometime decide that the defendant is "guilty" or "not guilty." The fact is, as history reminds us, a succession of juries may legitimately fail to agree until, at long last, the prosecution gives up. But such juries, perhaps more courageous than any other, have performed their useful, vital function in our system. This is the kind of independence which should be encouraged. It is in this independence that liberty is secured.

The fact is that in many phases of criminal law we have come a long, long way since 1896. There is no longer any place for the Allen charge. For good reasons it has acquired its descriptive as the "dynamite charge" (variously called the "nitroglycerin charge") at the hands of the Bar. This is an intrusion by the Judge into the exclusive domain of fact finding by the jury. It is nonetheless so merely because the Judge does not indicate which of two decisions must be reached.

What is worse, it is becoming more and more commonplace. Nearly every

hard-fought criminal case coming to this Court reveals the Judge sooner or later giving this charge or some embellishment of it.[1] Too often, as in these two cases, it was but a matter of a few hours after the jury had retired to deliberate. And not infrequently, as we were led to believe on oral argument in both of these cases, it occurs with the last jury in the last case at that Division point for that particular term. To the other pressures which are irrelevant is the other and natural one of a personal consideration for the Judge who, like jurors, also wants to go home. The charge pointedly reminds them that to hold out disrupts the plans of all.

I think a mistrial from a hung jury is a safeguard to liberty. In many areas it is the sole means by which one or a few may stand out against an overwhelming contemporary public sentiment. Nothing should interfere with its exercise. In the final analysis the Allen charge itself does not make sense. All it may rightfully say is that there is a duty to consider the views of others but that a conscientious person has finally the right and duty to stand by conscience. If it says that and nothing more it is a superfluous lecture in citizenship. If it says more to declare that there is a duty to *decide*, it is legally incorrect as an interference with that rightful independence.

The time has come, I think, to forbid this practice. Like the silver platter, this is too dear to keep. The cost in fundamental fairness is too great.

I therefore dissent.

Rehearing denied; BROWN, Circuit Judge, dissenting.

1. The frequent use of such a charge is exemplified by the fact that Judge William C. Mathes of the Southern District of California has thought it helpful to add a readily available boiler plate version of this charge to his list of standard jury instructions. 27 F.R.D. 39, 102. To it he appends an imposing array of cited precedents showing its routine use.

While the judiciary and the bar should be rightly indebted to Judge Mathes for his labors, I find the same difficulty with his charge as with similar ones. The sugar-coating does not remove its basic unfairness or its coercive effect on the constitutional ideal of the independent jury.