Thomas Lester **THAGGARD**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 22120.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1965.

Rehearing Denied Jan. 6, 1966.

Certiorari Denied March 28, 1966.

See 86 S.Ct. 1222.

Ira DeMent, Montgomery, Ala., Samuel A. Beatty, Prof. of Law, University, Ala., Whitesell, Alton & DeMent, Montgomery, Ala., for appellant.

Ben Hardeman, U. S. Atty., J. O. Sentell, Asst. U. S. Atty., Montgomery, Ala., for appellee.

Before TUTTLE, Chief Judge, and GEWIN and COLEMAN, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal from a conviction and sentence for violation of the Federal bank robbery statute, 18 U.S.C.A. § 2113 (b).[1]

The facts which could be found by the jury in support of their verdict are substantially as follows:

On the morning of March 6, 1963, appellant received his February, 1963 bank statement from the Union Bank & Trust.

---

1. This statute provides: "(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100.00 belonging to, or in the care, custody, control, management, or possession of any bank, or any savings and loan association, shall be fined not more than $5,000.00 or imprisoned not more than ten years, or both * * *"

Company, showing a balance in excess of $43,000. He showed this statement to a friend, remarking, "You don't make this kind of money in used car business." It appears that the bank had received two deposits aggregating approximately $43,-000 for the account of the Alabama Power Company and that, as the result of a bookkeeping mistake, this sum was erroneously credited to the account of Alabama Motors Company (owned by Thaggard). On the same morning, March 6th, Thaggard went to the statement teller of the bank and requested the amount of his balance in the Alabama Motors account. The teller obtained this balance from the bookkeeping department, wrote it down for Thaggard in the amount of $43,498.38, and handed him the piece of paper containing this information after again verifying the amount at his request. Shortly thereafter Thaggard asked a paying teller at the bank for the amount of the balance in the Alabama Motors account. This teller also called the bookkeeper, obtained the same balance, and handed appellant a piece of paper containing this information. Appellant then handed this same paying teller a check in the amount of $43,000 and said he wished to withdraw that amount. At the paying teller's request, appellant endorsed this check, whereupon the teller again called the bookkeeping department to determine whether there were any uncollected items against the account, thereafter paying the amount of the check to appellant. The paying teller assumed at the time of payment that the check was good and did not in any way misread the check, i. e., she intended to pay Thaggard the $43,000.

Around ten minutes after the payment to appellant, the true facts were discovered and appellant was finally located and taken to police headquarters on the night of March 6th, although he was not then under arrest. At this time appellant admitted that he had not made the $43,000 deposit, that he knew of no one who would have had any occasion to make such a deposit to his account and that the money did not belong to him. Subse-quently, appellant was indicted under the Federal bank robbery statute and, after trial by jury in the district court, was found guilty. From this judgment Thaggard has taken this appeal.

The appeal here is based upon three principal contentions. The first is that in order to be guilty of violation of the Federal bank robbery statute, a case of common law larceny must be proved, whereas the principles underlying common law larceny were not presented to the jury in the charge of the trial court. The second is that if the Federal bank robbery statute is construed to comprehend something broader than common law larceny, then the conviction must be reversed because the trial court did not give the statute such broad construction, and the issue was, therefore, not properly presented to the jury. The third contention is that the trial court erred in giving the so-called "Allen" charge, see Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, as putting improper pressure on the jury to bring in a verdict.

At the outset it will be noted that the Federal statute makes no mention of "larceny;" it is couched in terms of "steal and purloin," and this is what was charged in the indictment. Nevertheless appellant confidently bases his contention on the dictum in United States v. Rogers, (4 Cir.) 1961, 289 F.2d 433, where the Court said, at page 437, "We accept the defendant's premise that paragraph (b) of the bank robbery act reaches only the offense of larceny as that crime has been defined by the common law." With great deference to the views of the Court of Appeals for the Fourth Circuit, we cannot agree with this conclusion. We believe that as to this matter the Supreme Court's decision in United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430, leads to a contrary result. In Turley the Supreme Court had before it the interpretation of the National Motor Vehicle Act, commonly known as the Dyer Act, which provides, "Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined

not more than $5,000.00 or imprisoned not more than five years, or both." The indictment there before the court charged that Turley lawfully obtained possession of an automobile from its owner for the purpose of driving certain of his friends to the homes of the latter in South Carolina, but that, without permission of the owner, and with intent to steal the automobile, Turley converted it to his own use and unlawfully transported it in interstate commerce to Baltimore, Maryland, where he sold it without permission of the owner. As the Supreme Court said, "The information thus charged Turley with transporting the automobile in interstate commerce knowing it to have been obtained by embezzlement rather than by common-law larceny."

Dealing with the question of the meaning of this statute, the Court said,

"We recognize that where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning [citing as a footnote United States v. Carll, 105 U.S. 611, 26 L.Ed. 1135; United States v. Smith, 1820, 5 Wheat. 153, 5 L.Ed. 57; United States v. Brandenberg, 3 Cir., 1944, 144 F.2d 656. But 'stolen' (or 'stealing') has no accepted common-law meaning. On this point the Court of Appeals for the Fourth Circuit recently said:

" 'But while "stolen" is constantly identified with larceny, the term was never at common law equated or exclusively dedicated to larceny. "Steal" (originally "stale") at first denoted in general usage a taking through secrecy, as implied in "stealth," or through stratagem, according to the Oxford English Dictionary. Expanded through the years, it became the generic designation for dishonest acquisition, but it never lost its initial connotation. Nor in law is "steal" or "stolen" a word of art. Blackstone does not mention "steal" in defining larceny—"the

felonious taking and carrying away of the personal goods of another"—or in expounding its several elements. IV Commentaries 229 et seq.' Boone v. United States, 4 Cir., 1956, 235 F.2d 939, 940."

The Supreme Court ended its opinion by saying,

" 'Stolen,' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny."

In this decision the Supreme Court expressly disapproved of this Court's prior decision in Murphy v. United States, 5 Cir., 206 F.2d 571 (an automobile obtained by false pretenses).

But, says the appellant, this case was tried to the jury on the theory of common law larceny. It is pointed out that the trial court used the word "larceny" several times in his charge to the jury. It is plain that the trial court did intend to apply the rule set down in United States v. Rogers, supra. The court charged "An essential element of the crime of larceny is the felonious taking; that is, the wilful, conscious, intentional, voluntary taking, the taking with an evil motive and with a bad purpose and with a criminal intent; taking away the personal property of another. In addition, the law says in a prosecution under this statute the taking must be by a trespassing; that means it must be an invasion of the owner's right of possession in the property concerned, money in this case. However, the law says that when the owner that transfers the property acts under a unilateral mistake, that is, a mistake only on his part, that is a mistake of fact, and intends only to relinquish title to the lawful owner, the delivery of the money to the person inducing the mistake, if you find that to be the case in this particular instance, may be ineffective to transfer ownership of the property. Now if the receiver of the property feloniously—as I

have defined that term to you——induces the mistake that results in the delivery of the property to him, and receives the money with a felonious intention of appropriating it to his own use, and does so appropriate it, then the receipt and removal of the money may be larceny within the meaning of the statute under which this indictment is laid, and under which this defendant, T. L. Thaggard, is being prosecuted."

The court then said further, in construing the word "trespass," "In this type of larceny prosecution, by the term, 'by trespass' as I have used it and as the law defines it, means the taking of the property, money here, without the owner's consent. The intention of the owner not to part with title to the money when relinquishing possession of it to the defendant or the receiver, Thaggard in this case, is the essence of the offense of larceny, insofar as this prosecution is concerned. Now the correct distinction in cases of this kind seems to be, under the law, that if by means of any trick or fraud the owner of the property, the bank, the Union Bank and Trust Company, is induced to part with the possession only, still meaning to retain the ownership, the taking and removal by such means, where the required felonious intent is present and where the other elements are present, is, under the law, larceny. On the other hand, if the owner intentionally, that is, the Union Bank and Trust Company, parts not only with the possession of the goods, the money, but with the ownership in the goods, also, the offense of the party obtaining the money will not be larceny under the law in this case, but if anything, the crime of obtaining money by means of false pretenses and subject to prosecution in the state court."

■ It is clear from this charge that the appellant was benefited by the narrow construction placed upon the statute by the trial court. In other words, the trial court expressly charged that if the bank and its agents intended to give possession and ownership of the money to Thaggard, having been induced to do so by false pretenses or by mistake induced by Thaggard, the elements of the crime were not proved. The trial court, under the construction of the statute which we place on it, required the proof of more than the government is required to prove in a bank robbery case. Nothing said in the trial court's charge increased the burden on appellant, but, rather, as we have indicated, it was considerably more beneficial to him than would have been a correct charge. This, then, disposes of the first two criticisms made by appellant.

■ As to appellant's subsidiary contention that there was no proof to warrant the court's reference to "trick" or "fraud" or "inducement" by appellant, we think the statement of facts at the beginning of this opinion clearly refute this contention. There can be little doubt but that the jury could have found that Thaggard intended by preparing a check payable to cash in the amount of some $43,000 in excess of the amount he knew he was entitled to withdraw from the bank, "induced" the bank to part with possession, if not title, to money that did not belong to him, we think it is not too strong a word for the court to speak of this in terms of a "trick" or a "fraud," leaving up to the jury, of course, the question whether Thaggard did these things with criminal intent.

Next, we consider the criticism by appellant of the use by the trial court of a charge after more than a day's deliberation, patterned after the "Allen" charge.[2]

2. "THE COURT:
Keep your seats, please. I realize you haven't, since yesterday afternoon, asked me for any additional instructions. However, I know that you jurors are attempting to discharge your responsibilities in a conscientious manner. I stand ready at any time, if you request it, to charge you additionally on the law. I have made the charge on the law of this case as simply as the applicable law will permit me to do it. I charge you additionally at this time that this is an important case. That all trials are expensive. Your failure to agree upon a verdict will necessitate another trial

This court, although sometimes reluctantly, has approved the "Allen" charge, while carefully assuring ourselves that there are not engrafted upon it any partial or one-sided comments. We note that the charge given here by the trial court contained none of the objectionable language that appeared in Powell v. United States, 5 Cir., 1961, 297 F.2d 318, or in Huffman v. United States, 5 Cir., 1962, 297 F.2d 754, or in Green v. United States, 5 Cir., 1962, 309 F.2d 852. Nor was it one-sided, as was the case in the Fourth Circuit case of United States v. Rogers, 289 F.2d 433. Such a charge, so long as it makes plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial, cf. dissenting opinion in Huffman v. United States, 297 F.2d 754, at 759, is still a permissible charge to be given in proper circumstances in this Circuit.

We think the language does not go beyond the bounds of the permissible scope of such a charge.

The judgment is affirmed.

COLEMAN, Circuit Judge (specially concurring):

A dissent on my part as to the giving of the Allen charge in this case would not affect the outcome. I, therefore, refrain from it at this early stage of my Federal Judicial career. I do wish by this specially concurring opinion, however, to record my views with reference to the use of the Allen or "dynamite" charge in Federal criminal prosecutions.

I realize that as long as Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) stands it is our duty to follow it. I entertain the thought that if it were submitted to the Supreme Court today the result might not be the same as it was in 1896. I cannot see that the qualifications, reservations, and escape clauses customarily used in modern versions of the charge save it from being what it is, and what the jury believes it

equally as expensive. This court is of the opinion that the case cannot be again tried better or more exhaustively than it has been on either side. It is therefore very desirable that you should reach a verdict. This court does not desire that any juror should surrender his conscientious convictions; on the other hand, each juror should perform his duty conscientiously and honestly according to the law in this case and according to the evidence in the case, and although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his fellows, yet in order to bring twelve minds to a unanimous result you jurors must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of the other (116) members on the jury. You should consider that the case must at some time be decided; that you were selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to more intelligent, more impartial, or more competent to decide it, or that clearer evidence will be produced on one side or the other. In conferring together, you ought to pay proper respect to each other's opinions, with a disposition to be convinced by each other's arguments; and, on the other hand, if much the large number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression upon the minds of so many equally honest, equally intelligent with himself, who have heard the same evidence with the same attention and with an equal desire to arrive at the truth of the matter and under the sanction of the same oath. On the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated on this jury, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellow jurors. With that additional charge, you retire to the jury room."

to be, a direct appeal from the Bench for a verdict.

Before proceeding further, however, I would like to set out the exact form of the charge which did receive approval in the Allen case, supra.

As taken from Page 501 of 164 U.S. Reports, page 157 of 17 S.Ct. the charge approved on appeal was as follows:

"That, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority".

The cases show that this instruction has frequently been extended and embellished, far beyond the language just quoted.

In the instant prosecution, it is significant that there had already been one hung jury in a previous trial. At 12:37 P.M. on the second day of deliberation, the record quotes the District Judge as saying "this seems to be a rerun of the last case from beginning to end". When the jurors returned from lunch, and without their requesting further instructions, the Court gave what is now commonly referred to as the Allen charge, but it did not follow the 1896 precedent in several particulars. For example, the jury was told "all trials are expensive. Your fail-ure to agree upon a verdict will necessitate another trial equally as expensive. * * * you should consider that the case must at some time be decided".

Certainly, all trials are expensive. The Government knows this when the prosecution is begun. To me, expense is never a consideration either to be mentioned or entertained in the dispensation of justice. In these days of ever increasing governmental costs, it requires no wild flight of the imagination to note what an ordinary juror thinks about the expenses of the government or how a reminder of expenses will likely affect his reasoning and reactions.

Moreover, I am not aware of any law which requires that a case "must at some time be decided". True, under justifiable circumstances a case must be tried, but it is intrinsic in the jury system that a jury may never be found to agree unanimously on the guilt or innocence of a person charged with crime. I have known of many cases that were tried to as many as three juries and agreement was never reached. It is my belief that no law requires any criminal prosecution to be decided, but simply requires that it be submitted to a fair and impartial trier of the fact.

Article III, Section II, Clause 3 of the United States Constitution requires that the trial of all crimes, except in cases of impeachment, shall be by a jury. The Sixth Amendment commands that in all criminal prosecutions the accused shall enjoy the right to a trial by an impartial jury. To my mind this means, and ought to mean, a jury free of every influence except the law and the evidence.

I agree with what Judge Brown said in Huffman v. United States, 5 Cir., 297 F.2d 754 (1962). "The strength of the jury system is its absolute, real, actual independence. It must take its instruction on the law from the Judge, but the jury alone determines the facts." " * * There is no longer any place for the Allen charge."

I likewise heartily agree with what Judge Wisdom said in Andrews v. United States, 5 Cir., 309 F.2d 127 (1962), and

in Green v. United States, 5 Cir., 309 F.2d 852 (1962). See also United States v. Rogers, (Cir), 289 F.2d 433 (1961).

I recall the words of Mr. Chief Justice Fuller in Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841, "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling".

I also recall the words of Mr. Justice Frankfurter, in a different situation but clearly analogous, "An experienced trial judge should have realized that such a long wrangle in the jury room as occurred in this case would leave the jury in a state of frayed nerves and fatigued attention, with the desire to go home and escape overnight detention, particularly in view of a plain hint from the judge that a verdict ought to be forthcoming". Bollenbach v. United States, 326 U.S. 607, at 612, 66 S.Ct. 402, at 405, 90 L.Ed. 350.

There is no intention of criticizing the District Judge for using this instruction. It is being done all the time, and it seems to the writer from considerable trial experience that the practice is growing instead of diminishing. It likewise seems from practical experience that after a jury has retired to consider its verdict, has done so for some time, and has indicated that it is in hopeless deadlock, every juror, not being trained in the law, understands from the Allen charge that what the Judge wants is a verdict. So, there the previously reluctant juror stands, fancying himself in opposition to the wishes of a United States Judge, which is about the last position in which he ever wanted to find himself. He is only exercising everyday human nature when he gets out of that unhappy predicament just as quickly as he can.

The real burden of what I am saying is that the essential meaning of Constitutionally guaranteed trial by jury is that once the jury has retired to consider of its verdict it should not be subjected to so much as the appearance of any influence from any source for the purpose of producing a verdict. The jurors should be left to the unhampered expression of their own consciences, independently arrived at.

In expressing these views I do so with greatest deference to the opinion of the able, dedicated, experienced Judges who feel that there was no reversible error in the charge used here.

## ON PETITION FOR REHEARING

PER CURIAM:

It is ordered that:

The Petition for Rehearing filed in the above styled and numbered cause be, and the same is, hereby denied;

The Motion to Extend Opinion filed in the above styled and numbered cause be, and the same is, hereby denied;

The Motion to Certify Questions to the Supreme Court filed in the above styled and numbered cause be, and the same is, hereby denied.