**F I L E D**

**PUBLISH**

**July 14, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SLADE D. ZABRISKIE, also known
as Slade Dean Zabriskie,

      Defendant - Appellant.

No. 02-4228

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DEAN N. ZABRISKIE, also known as
Dean Calloway Zabriskie,

      Defendant - Appellant.

No. 02-4225

---

**Appeals from the United States District Court
for the District of Utah
(D.C. Nos. 2:00-CR-289-01-TC and 2:00-CR-289-03)**

---

Diana Hagen, Assistant United States Attorney, (Paul M. Warner, United States
Attorney, and Michael S. Lee, Assistant United States Attorney, with her on the
brief), Salt Lake City, Utah, for Plaintiff-Appellee.

G. Fred Metos, Salt Lake City, Utah, for Defendants-Appellants.

Before **SEYMOUR**, **McKAY**, and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Dean and Slade Zabriskie appeal the district court's denial of their motion for new trial on the grounds (1) the jury lacked sufficient evidence to convict them of concealing and harboring a fugitive from arrest in violation of 18 U.S.C. § 1071, and (2) the district judge erred in giving a single juror a modified *Allen* instruction[1] during an *ex parte* colloquy with him while deliberations were proceeding.  Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand the matter to the district court for a new trial.

## I. BACKGROUND

Dean Zabriskie, a criminal defense attorney, was the president of Zabriskie & Associates between 1993 and 1999.  Slade Zabriskie, Dean's son, is a non-lawyer and the former vice-president of Zabriskie & Associates.  Gerry Branagan was a convicted felon who specialized in burglarizing middle and

---

[1] "An *Allen* instruction is, in effect, a charge given by a trial court that encourages the jury to reach a unanimous verdict so as to avoid a mistrial." *United States v. McElhiney*, 275 F.3d 928, 935 (10th Cir. 2001).  It derives its name from *Allen v. United States*, 164 U.S. 492, 501 (1896).

upper-class homes in various states. Branagan had a penchant for stealing jewelry, firearms, precious metals, paintings and porcelain figures. He also purchased used motor vehicles under various aliases, assuring the previous owners he would take care of the licence plates; in fact, he often used the vehicles until their registrations expired and moved to the next vehicle.

In 1993, Utah filed various felony charges against Branagan. Trial was set for February 13, 1995. However, the day before trial, Branagan met with Dean and then fled to California. The following day, after noting Branagan's failure to appear, the district judge convicted him *in absentia* because the trial had been subjected to a multitude of procedural delays. On February 27, 1995, a state warrant was issued for Branagan's arrest for failure to appear for trial. On June 19, 1996, a federal warrant was issued for his arrest for unlawful flight to avoid prosecution.

In August 1997, while still a fugitive, Branagan contacted Dean after having fled from the police during a routine traffic stop during which Branagan had used the alias, Keith Sterling. In an effort to avoid detection, Branagan sought to eliminate any personal property which would lead the police to him. Branagan sent Dean a key to his Laguna Nigel condo, directing both Dean and Slade to take control of his Toyota pickup truck which was involved in the traffic stop, sell his yacht, and move all of his belongings from the condo.

On August 17, 1997, three days after talking with Branagan, Dean contacted a moving company to haul some items from Branagan's condo, naming Slade as the contact person. The property arrived in Provo, Utah, on September 15, 1997, with Dean signing for the property. During that time, Dean and his wife also traveled to southern California to remove Branagan's remaining property from his condo.

On September 17, 1997, Dean re-registered Branagan's truck in his own name. On May 8, 1998, Slade sold the truck to a car dealer. Dean gave himself power of attorney over Branagan's yacht and on September 8, 1997, authorized its sale. With Slade conducting the negotiations, Dean sold the yacht on November 10, 1998, depositing the proceeds in the Zabriskie & Associates' small business account. The Zabriskies also received at least 21 packages from Branagan which were later found to contain stolen goods.

During this period, Dean communicated with Kelly Schauerhammer, Branagan's daughter, on his behalf and assisted in her personal affairs. Dean bought a car for her, paid her trailer pad rent and gave her cash. Dean, however, did not tell Ms. Schauerhammer where Branagan was living and in fact provided her a false return address in France to potentially throw the police off Branagan's track.

Based on the above conduct, Dean was charged in a ten-count indictment

while Slade was charged in a three-count indictment. On June 24, 2002, the

Zabriskies were tried jointly. Jury deliberations began on July 11, 2002.

On July 12, 2002, the jurors sent the following note to the trial judge:

> If after extensive deliberation the jury is not able to come to a
> unanimous decision, how do we proceed? If extended deliberations
> do not change any jurors' positions, is further deliberation needed? . .
> . There has been at least one incident of 'violence to individual
> judgement.'

(R. Vol. 12 at 4.)

Two days later, the judge received another note from the jury, this time

asking, "[w]hat advice do you have for the jury when one or two people blatantly

disregard the instructions you have given?" (*Id*. at 16.) The following day, the

judge received a note from the presiding juror stating, "[o]ne person is completely

refusing to follow the law and rules as you have indicated. I personally am

frustrated beyond my patience . . . ." (*Id*. at 21.) The judge responded to these

notes by insisting the jury continue deliberating.

On July 16, 2002, the district judge received another note, signed by all of

the jurors except Mr. Melvin Graddy, stating:

> We have a serious problem here . . . . We need major help/advice!! . .
> . There's a juror who absolutely, positively will not deliberate with
> us. He says he feels this way and he will have nothing more to say.
> We are trying to explain what deliberation means to him, but he
> doesn't care and is uninterested. You previously reminded us that we
> are jurors and we have sworn to follow your rules, but he says he
> won't and he doesn't care. He won't speak to us. He won't
> deliberate with us. He just says 'I feel this way and I will never

change.'

(Appellant D. Zabriskie App. at 33.) Immediately thereafter, the district judge received yet another note. The note stated that the jury had "hit a complete brick wall" and that "a juror [] has stated numerous times he/she would not change his or her position." (*Id.* at 34.)

Believing that Mr. Graddy was the recalcitrant juror and motivated by concerns of potential jury nullification, the judge, *sua sponte*, raised the possibility of dismissing him for good cause under FED. R. CRIM. P. 23(b). Before doing so however, the judge, over the Zabriskies' objections, interviewed three jurors, *ex parte* and *in camera*, seeking to ascertain whether Mr. Graddy was engaging in nullification or had made up his mind based on the evidence.

The interviews of the three jurors confirmed the recalcitrant juror was in fact Mr. Graddy. The interviewed jurors said Mr. Graddy had refused to deliberate from the beginning of deliberations because he had made up his mind. Thereafter, the judge reported the substance of her investigation to counsel and offered to give an *Allen* charge to the entire jury; the Government and the Zabriskies objected. The Government instead sought to remove Mr. Graddy for cause under FED. R. CRIM. P. 23(b). The judge decided removal was, at least, premature and additional investigation was necessary. After apprising counsel of her intentions, and over the Zabriskies' objection, the judge had the following *ex*

*parte in camera* colloquy with Mr. Graddy:

THE COURT:     [...] First of all, Mr. Graddy, I want you to know that I don't want to hear at all where you stand on the case or others stand or, you know –just like I said it before. Don't tell me anything about who is leaning which way and numbers, okay?

MR. GRADDY:    Yes, ma'am.

THE COURT:     But I understand that you have come into a block, and your fellow jurors say that some of that block is due to you. Are you participating in jury deliberations?

MR. GRADDY:    Yes, ma'am.

. . .

THE COURT:     Are you participating in the jury deliberations?

MR. GRADDY:    Yes, ma'am.

. . .

THE COURT:     All right. You know, I've given several instructions when this problem started coming up, which it did early, saying that it was the obligation of each juror to reexamine his or her own views. In other words, you didn't go in there—did you go—you had to go in with an open mind.

MR. GRADDY:    Yes, ma'am. I did.

THE COURT:     And then you have to look at the evidence and listen to the arguments and keep an open mind to what others are saying, but meanwhile you do not sacrifice your own firm convictions.

MR. GRADDY:    Yes, ma'am.

-7-

THE COURT:        You must at all times be open and be willing to participate and deliberate. Do you believe you have followed that?

MR. GRADDY:       Yes, ma'am. I'll follow it even more if need be.

THE COURT:        Well, I know its been a long time and I am not telling you in any way to sacrifice your personal beliefs or—if they are based on the evidence. Are you attempting to base your decision on the evidence?

MR. GRADDY:       Yes, ma'am. I went home plenty of nights, laying there, thinking about this and thinking about that, going over it in my mind, numerous times at home and in the deliberating room.

THE COURT:        And is it fair to say that you have an open mind, and that any opinions you have are based solely on the evidence?

MR. GRADDY:       Yes, ma'am.

THE COURT:        Are you prepared to follow the law as I tell you it is?

MR. GRADDY:       Yes, ma'am.

THE COURT:        Okay. And you won't in any way think that that's just sort of a guide? That is what you must follow. That's the absolute rule. You understand that?

MR. GRADDY:       Yes, ma'am. I do.

THE COURT:        Okay. And the rule, and one of those most important ones—and I want to read it for you. And I just–I've read it for you–to all of you: It's your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without reaching–without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. All right? Do you

-8-

understand that?

MR. GRADDY:     Yes, ma'am.

THE COURT:     And can you follow that?

MR. GRADDY:     I certainly can.

THE COURT     Good. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. Can you do that?

MR. GRADDY:     Yes, ma'am.

THE COURT:     All right. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors for the mere purpose of returning a verdict. Can you do that?

MR. GRADDY:     Yes, ma'am.

THE COURT:     So I think the gist of it is [] you must participate at all times. You must keep an open mind and listen to and discuss with your fellow jurors, and be ready to change your mind if you feel the evidence requires it, but don't give up your own honest conviction about the evidence just to give in. Do you understand that?

MR. GRADDY:     Yes, ma'am. I do.

THE COURT:     All right. And I request that you do that.

MR. GRADDY:     Yes, ma'am.

THE COURT:     Okay. Thank you.

(*Id*. at 54-58.)

After the above colloquy, the jury, including Mr. Graddy, resumed

deliberations at 12:20 pm.  The judge relayed to counsel the substance of her interview with Mr. Graddy and, based on Mr. Graddy's stated willingness to participate in the deliberations, ruled that there were insufficient grounds to remove him.

At 1:45 pm, the judge received another note from the jury indicating that constructive deliberations had stopped.  While the parties were discussing this latest development with the judge, the jury submitted another note stating "everyone is talking now."  (*Id*. at 32.)

About six hours later, the district judge received yet another note from jurors indicating "deliberations have gone very well this afternoon.  Thank you for your help . . ." and informing her they had reached a verdict.  The jury found Dean guilty of two counts: concealing and harboring a fugitive from arrest and the receipt, concealment and disposal of stolen goods in violation of 18 U.S.C. § 1071 and 18 U.S.C. § 2315, respectively.  Slade was convicted of a single count of concealing and harboring a fugitive from arrest in violation of 18 U.S.C. § 1071.

The Zabriskies filed motions for a new trial pursuant to FED. R. CRIM. P. 33 claiming: (1) the jury lacked sufficient evidence to convict either of them of concealing and harboring a fugitive from arrest in violation of 18 U.S.C. § 1071, and (2) the judge erred in giving a single juror a modified *Allen* instruction during

an *ex parte* colloquy with her during the course of deliberations. Their motions were denied. This appeal followed.

## II. <u>DISCUSSION</u>

On appeal the Zabriskies contend the district court erred in denying their motion for new trial under FED. R. CRIM. P. 33 (a) arguing the government produced insufficient evidence for conviction and the existence of impermissible juror contact. FED. R. CRIM. P. 33(a) provides in relevant part: "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." We review the district court's denial of a Rule 33 motion for abuse of discretion, reversing only if the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances. *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996). We first consider their sufficiency of the evidence argument and then turn to their juror contact argument.

### *A. Sufficiency of the Evidence*

In evaluating a sufficiency of the evidence challenge, this Court will "ask only whether taking the evidence - both direct and circumstantial, together with the reasonable inferences to be drawn therefrom - in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir.

-11-

1999) (quotation marks and citation omitted). The evidence supporting the conviction must be substantial and raise more than a suspicion of guilt. *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997). In conducting this review this Court "may neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997) (quotation marks and citations omitted). It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented.

The Zabriskies were convicted under 18 U.S.C. § 1071 for harboring and concealing Gerry Branagan from arrest.[2] Various circuits have articulated the elements necessary for conviction of harboring or concealing a fugitive. Generally, the government must "prove beyond a reasonable doubt that (1) a federal warrant has been issued for the fugitive's arrest, (2) the harborer had knowledge that a warrant had been issued for the fugitive's arrest, (3) the defendant actually harbored or concealed the fugitive, and (4) the defendant

_____

[2] 18 U.S.C. § 1071 provides:

> Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined under this title or imprisoned not more than one year, or both; except that if the warrant or process issued on a charge of felony, or after conviction of such person of any offense, the punishment shall be a fine of [sic] under this title, or imprisonment for not more than five years, or both.

-12-

intended to prevent the fugitive's discovery or arrest." *United States v. Mitchell*, 177 F.3d 236, 238 (4th Cir. 1999); *see also United States v. Zerba*, 21 F.3d 250, 252 (8th Cir. 1994); *United States v. Yarbrough*, 852 F.2d 1522, 1543 (9th Cir. 1988); *United States v. Lockhart*, 956 F.2d 1418, 1423 (7th Cir. 1992).

The Zabriskies do not contest whether the first and second elements were met. Rather, they argue the government failed to adduce any evidence that they harbored or concealed Branagan or intended to prevent his discovery or arrest by the police. The Zabriskies argument is essentially that their interactions with Branagan do not fall within the definition of "harbors or conceals" as articulated by other Circuits. They argue that harboring or concealment must consist of some affirmative act of concealment such as actually hiding the fugitive or giving him food, shelter or clothing. They cite *United States v. Foy*, 416 F.2d 940 (7th Cir. 1969) and *United States v. Mitchell*, 177 F.3d 236 (4th Cir. 1999) in support of this argument and maintain their conduct falls short. They also rely on *United States v. Shapiro*, 113 F.2d 891 (2d Cir. 1940) for the proposition that providing financial assistance to a fugitive is not harboring or concealment.

It is true that "[s]ection 1071 does not proscribe all forms of aid to a fugitive" and that the "actual harboring or concealment element requires some affirmative, physical action by the defendant." *Mitchell*, 177 F.3d at 239 (internal quotations omitted). It is also true that providing financial assistance, *by itself*,

has generally been found insufficient to support a charge of harboring or concealment. *See United States v. Stacey*, 896 F.2d 75, 77 (5th Cir. 1990); *Yarbrough*, 852 F.2d at 1543; *United States v. Silva*, 745 F.2d 840, 849 (4th Cir. 1984); *Shapiro*, 113 F.2d at 892. "[B]ut, any physical act of providing assistance . . . to aid the prisoner in avoiding detection and apprehension will make out a violation of section 1071." *United States v. Green*, 180 F.3d 216, 220 (5th Cir. 1999)(internal quotation and citation omitted), *see also Lockhart*, 956 F.2d at 1423; *Yarbrough*, 852 F.2d at 1543.

Consider the analogous case of *United States v. Erdman*, where the defendant assisted a fugitive by helping him to repaint his van a different color to make it less recognizable, possessing keys to the storage facility for the van and acting as its caretaker, cashing checks drawn on the fugitive's bank account, and helping him to find jobs and assisting him in the performance of them. 953 F.2d 387, 390-91 (8th Cir. 1992). The Eighth Circuit Court of Appeals found this constituted sufficient evidence for the jury to reasonably infer the defendant had harbored the concealed the fugitive. *Id*. at 391. The evidence in this case, like *Erdman*, went beyond the simple provision of financial assistance and adequately established affirmative, physical action on the part of the Zabriskies to aid the Branagan in avoiding detection and apprehension.

In this case, the evidence indicated the Zabriskies' actions were directly

-14-

aimed at either preventing Branagan's capture by the police or misleading the police in their search for him. First, a reasonable jury could have found Slade possibly procured false identification for Branagan, including a social security card, which enabled Branagan to assume a new identity and resume his criminal activities.[3] Second, Dean communicated with Branagan's daughter on his behalf, bought a car for her, paid her trailer pad rent and gave her cash , all while providing her a false return address in France to potentially throw the police off Branagan's track. Third, after Branagan fled from the police during a traffic stop, the Zabriskies disposed of any personal property including the truck itself which could lead the police to connect the alias given by Branagan during the stop with his real identity.[4] For instance, Dean registered Branagan's Toyota pickup in his name and Slade sold the pickup to a car dealership. In addition, Branagan mailed the key to his condo in Laguna Nigel, California to Dean who, three days after the

---

[3] The Government concedes that much of the evidence regarding the Zabriskies' provision of false identification to Branagan occurred prior to the issuance of the warrant and are not punishable under § 1071. *See United States v. Magness*, 456 F.2d 976, 978 (9th Cir. 1972) (conduct prior to knowledge of warrant not punishable). However, there was at least an additional undated exchange of false identification materials which a reasonable jury could have inferred occurred subsequent to the issuance of the warrant. Included with the false identification materials were several notes written from Slade to Branagan.

[4] Branagan used the alias Keith Sterling during the traffic stop. However, he had used the alias Ron Bhoc when purchasing the Toyota pickup truck from the original owner. The truck was still registered to the original owner, to whom Branagan had given his phone number to his Laguna Nigel condominium.

traffic incident, hired a moving company to remove all of Branagan's property and move it to Utah. Dean listed Slade as the contact person for the move and when the property arrived in Utah, Dean signed for it. Approximately one month later, Dean and his wife traveled to California to assist in the moving of Branagan's personal property.

Finally, the Zabriskies enabled Branagan to move about unencumbered by his ill-gotten gain by receiving stolen property from Branagan in the mail and storing it for him in Dean's home[5] and a storage locker registered by Lucille Zabriskie in Brangan's daughter's name.[6] Dean Zabriskie, with Slade acting as a broker, also sold Branagan's yacht for $71,521.34 using Branagan's alias, Keith Sterling, on the power of attorney.[7] The Zabriskies also deposited in their business account a series of checks from Southeby's to Branagan[8] for the sale of

---

[5] During a search, officers discovered $59,070 in cash under Dean's bed, as well as loose gem stones valued at $37,000, a collection of Lladro figures valued over $21,000, over 100 firearms (10 of which were reported as stolen), 327 pieces of jewelry, unhung artwork, silverware and collectable coins.

[6] In searching the storage unit, authorities found burglary tools, jeweler's loops, and a box containing the original false identification documents for Ronald Bhoc and the notes authored by Slade.

[7] Apparently, Branagan had used the alias Keith Sterling to purchase the yacht but had registered the marina space in his real name.

[8] The checks were made payable to Ronald Court, one of Branagan's aliases. There were three checks deposited into law firm accounts in the amounts of $8,370.00, $38,877.00 and $106,533.00. While no direct payment was made from the accounts to Branagan, numerous cash withdrawals were made during the time Branagan was a

stolen goods sent to them because Branagan apparently did not maintain a bank account for fear of the police tracing it[9]

While one or two of these actions, viewed in isolation, may not be sufficient to uphold a conviction under section 1071, viewed as a whole, there is certainly substantial evidence to indicate the Zabriskies intentionally took affirmative physical actions to conceal Branagan from capture by the police. We therefore reject the Zabriskies' sufficiency of the evidence challenge.

### B. Juror Contact

We begin our discussion of the juror contact issue by noting the trial judge's broad discretion in investigating alleged acts of jury misconduct. *United States v. Bradshaw*, 787 F.2d. 1385, 1390 (10th Cir. 1986). The judge may initially act independently to investigate and address alleged juror misconduct. *United States v. Santiago*, 977 F.2d 517, 522 (10th Cir. 1992).

Based upon the notes received from the panel, we find no fault with the trial judge's decision to launch an investigation or to interview select jurors as part of that investigation. She properly kept counsel appraised of her actions, afforded counsel an opportunity for input and objection and kept a verbatim

---

fugitive.

[9] In the end, $210,153.29 was turned over to the government in a stipulated forfeiture.

record.[10] Nor do we fault her for separately interviewing Mr. Graddy, as it was her duty to conduct an adequate inquiry as to whether juror misconduct had occurred. *Bradshaw*, 787 F.2d. at 1390. An adequate inquiry would necessarily involve affording Juror Graddy an opportunity to present his version of events. But the selective delivery of an *Allen* charge is problematic.[11]

It is well established by this and other courts that an *Allen* charge is essentially a supplemental instruction given to *the jury* and designed to encourage a divided jury to agree on a verdict.[12] Typically, *Allen* charges recognize the dynamics of group deliberation and are distilled into two plausible admonitions,

---

[10] We are not concerned counsel were excluded from the interviews here. As previously mentioned, experience teaches that trial judges typically, and quite properly, act independently, to investigate and address alleged juror bias or misconduct. Here, the district judge's *ex parte*, but on the record, interviews with jurors, along with a recitation to counsel of what transpired during those interviews was an appropriate exercise of her discretion. Thus, the presence of counsel (or defendants) was not required to ensure fundamental fairness. *Snyder v. Massachusetts*, 291 U.S. 97, 105-08 (1934) (scope of Sixth Amendment guarantees); *see also*, *United States v. Santiago*, 977 F.2d 517, 522 (10th Cir. 1992)(scope of the presence of counsel requirement).

[11] Upon close inspection, we find the trial judge's admonitions interspersed throughout her conversation with Mr. Graddy match the essential elements of a typical *Allen* charge: a juror is told, *inter alia*, that absolute certainty cannot be expected in the vast majority of cases, that they have a duty to reach a unanimous verdict if they can conscientiously do so, and that dissenting jury members should accord some weight to the fact that a majority of jurors hold an opposing viewpoint. *See Allen*, 164 U.S. at 501. Because the trial judge's particular instruction departs from the "pure" charge contained in *Allen*, whether by omission or embellishment, we label it a "modified" *Allen* instruction. *McElhiney*, 275 F.3d at 936.

[12] *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 237-238 (1988)*; Gilbert v. Mullin*, 302 F.3d 1166, 1173 (10th Cir. 2002), *cert. denied*, 538 U.S. 1004 (2003).

-18-

that if not competing, are certainly in tension: each juror should adhere to conscientious convictions; and jurors in the minority position should reconsider their opinions in the light of those held by the majority. *See, e.g.*, *McElhiney*, 275 F.3d at 937-38. Therefore, it comes as no surprise that *Allen* charges have come under intense scrutiny for "blasting" verdicts out of juries.[13] We worry that when such a charge is read from the bench, jurors in the minority position, while perhaps privately unconvinced, vote with the majority for the sake of unanimity and to please the judge. *See id.* at 938; *Thaggard v. United States*, 354 F.2d 735, 741 (5th Cir. 1965) (Coleman, J., concurring on Denial of Petition for Rehearing).[14]

---

[13] Perhaps emblematic of the concern for coercion, *Allen* charges have also been known as "the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge . . . ." *United States v. Bailey*, 468 F.2d 652, 666 (5th Cir. 1972).

[14] As Judge Coleman writes in his concurring opinion:

> I recall the words of Mr. Chief Justice Fuller in *Starr v. United States*, 153 U.S. 614, 626 (1934) . . . 'It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.' I also recall the words of Mr. Justice Frankfurter, in a different situation but clearly analogous, 'An experienced trial judge should have realized that such a long wrangle in the jury room as occurred in this case would leave the jury in a state of frayed nerves and fatigued attention, with the desire to go home and escape overnight detention, particularly in view of a plain hint from the judge that a verdict ought to be forthcoming.' *Bollenbach v. United States*, 326 U.S. 607, 612 (1946).

Consequently, we have concluded an *Allen* instruction is impermissibly coercive when it imposes such pressure on the jury such that the accuracy and integrity of their verdict becomes uncertain, thereby violating a defendant's rights to due process, Sixth Amendment rights to an impartial jury trial and to a unanimous verdict. *McElhiney,* 275 F.3d at 937 n.4, 940. Our expressed concern about the coercive effect of *Allen* charges given to an entire jury panel is exacerbated here. We are now called upon to decide whether it is impermissibly coercive to selectively and privately give what amounts to an *Allen* instruction to a hold out juror. We think it is.

Our latent and lingering concern that jurors in the minority position will be coerced into yielding to the majority is made manifest when an *Allen* charge is delivered only to dissenting jurors and especially when it is done in private. It is impossible to gauge the impact the trial judge may have had on Mr. Graddy's epiphany. But the jury reached a verdict that very day contrary to prior persistent indications of intractable deadlock. The apparent anomaly raises serious questions as to the independence of the jury and the propriety of the convictions.[15]

*Thaggard*, 354 F.2d at 741.

[15] The Government's contention that any error here was harmless is without merit since the Government failed to meet its burden of negating *any reasonable possibility* that prejudice arose from the district court's *ex parte* communication with one of the jurors. *United States v. Carter*, 973 F.2d 1509, 1515 (10th Cir. 1992).

Despite the trial judge's good instincts and best intentions, what began as an appropriate investigation of potential juror misconduct took an unfortunate turn into the impermissible. Accordingly, we must **REVERSE** and **REMAND** the matter for a new trial.