**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

GREGORY OROZCO,

    Defendant - Appellee.

No. 18-3003

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CR-20074-JAR-1)**
_____

Carrie N. Capwell, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, District of Kansas, James A. Brown, Assistant United States Attorney, Chief, Appellate Section, with her on the briefs), Kansas City, Kansas, for Plaintiff - Appellant.

James R. Campbell, Coffman & Campbell, Burlington, Kansas, for Defendant - Appellee.
_____

Before **LUCERO**, **SEYMOUR**, and **KELLY**, Circuit Judges.
_____

**KELLY**, Circuit Judge.
_____

    Defendant-Appellee Gregory Orozco was convicted by a jury of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, 21 U.S.C. § 846 (Count 1), and possession with intent to distribute five grams or more of

methamphetamine, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) & 18 U.S.C. § 2 (Count 2). Mr. Orozco then filed a motion for a new trial alleging that the government violated his Sixth Amendment right by interfering with his right to call a witness on his behalf. The district court granted the motion, vacated the two convictions, and dismissed the underlying counts of the superseding indictment. United States v. Orozco, 291 F. Supp. 3d 1267, 1283 (D. Kan. 2017). The government now appeals, challenging the district court's finding of prosecutorial misconduct and the remedy imposed. Exercising jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings. On remand, the district court should vacate its dismissal of the underlying counts of the superseding indictment to allow for retrial.

## Background

On February 23, 2013, Deputy United States Marshals (DUSMs) converged on a pickup truck that matched the description of a fugitive's vehicle after observing one of its occupants engage in what appeared to be a drug transaction. 3 Aplt. App. 364–65, 448–50. The deputies ordered the three passengers — Tommy Cordell-Eastland, Amy Stimec-Smart, and Mr. Orozco — out of the vehicle. 2 Aplt. App. 273–74; 3 Aplt. App. 375, 379–80, 451–53. The deputies then searched the truck and found an unloaded firearm and a clear plastic case containing pills, marijuana, and four empty bags ordinarily used for storing user-quantities of narcotics. 3 Aplt. App. 387–89, 536–37. They also found a loaded magazine that fit the recovered firearm, id. at 527, 531–32, a large amount of U.S. currency, id. at 532–33, and a small pink nylon case containing SIM

cards, a flash drive, and a bag containing 41.3 grams of methamphetamine. Id. at 389–90, 505–09; 5 Aplt. App. 993.

Mr. Orozco was arrested and charged with two drug counts and two firearms counts. 1 Aplt. App. 26–28. At trial, Mr. Cordell-Eastland and his wife Brittany Eastland testified that they had purchased both user-quantities and occasional larger quantities of methamphetamine from Mr. Orozco. 2 Aplt. App. 133, 137, 144, 176–78; 5 Aplt. App. 557–59, 563. Mr. Cordell-Eastland also testified that the currency seized from the truck was the proceeds of his repayment of a $1,000 drug debt to Mr. Orozco. 2 Aplt. App. 155–56, 162, 165. Felix Leal and Jose Alejandro Ruiz testified that they gave or sold methamphetamine to Mr. Orozco for resale on numerous occasions. 4 Aplt. App. 631–32, 636; 5 Aplt. App. 907–08, 914–16. Mr. Ruiz also testified that he sold Mr. Orozco a chameleon-colored Chevrolet Camaro unrelated to narcotics transactions. 4 Aplt. App. 648–50. The government also called Deputy Chris Johnson, who testified that Mr. Orozco told him that the methamphetamine found in the car was his. 4 Aplt. App. 742.

Mr. Orozco intended to call two witnesses. However, one witness exercised his Fifth Amendment right not to testify. 5 Aplt. App. 950. The other witness, Mr. Ruiz-Salazar, was the brother of Jose Alejandro Ruiz, and was to testify that he, not his brother, was friends with and sold the Camaro to Mr. Orozco. Id. at 953–54. Mr. Orozco's attorney, James Campbell, requested a hearing to discuss the witnesses that the defense planned to present. Id. at 948–50. When the district court asked why Mr. Campbell sought a hearing, Assistant United States Attorney Terra Morehead suggested

3

that Mr. Campbell was concerned about the scope of her impeachment and cross examination; Mr. Ruiz-Salazar had been indicted in a federal drug case in the Western District of Missouri (WDMO), and cross examination or impeachment could have adverse consequences on his other pending case. Id. at 954. As for her own concerns, Ms. Morehead stated:

> [O]ne reason I wanted to bring it up is to make sure that there had been full conversation with him about the consequences of this, that he would be subject to cross examination. And if — if it's obviously determined that he's not being truthful, that there could be consequences, you know, beyond that, not only in this case but in the case there. Because if he were to perjure himself here, that could have consequences in his pending case there.

Id. She further sought to avoid a situation where Mr. Ruiz-Salazar took the stand only to invoke the Fifth Amendment at cross examination. Id. at 955–56. Ms. Morehead then informed the court that Mr. Campbell had been allowed the opportunity to interview Mr. Ruiz-Salazar prior to his testimony, and that Mr. Ruiz-Salazar's attorney, Tracy Spradlin, had indicated that Ms. Morehead would be allowed that same opportunity. Id. at 964. The court agreed, and it allowed Ms. Morehead to do so during recess. Id.

After recess, Mr. Ruiz-Salazar no longer wanted to testify. Id. at 1008. According to Ms. Spradlin, Mr. Ruiz-Salazar was worried about incriminating himself, and was "feeling a little uneasy." Id. at 1009. Ms. Spradlin further expressed that "in relation to some of the stuff going on with his current case, he's decided that he would rather not [testify]." Id. Mr. Campbell then speculated that "Mr. Ruiz'[s] position changed when he was advised through [Ms. Spradlin based on her conversation with Ms. Morehead] that his testimony may very well have an influence on his case in the Western District."

Id.

In response, Ms. Morehead explained:

I would take exception that I ever represented anything like that to his counsel. And I don't think she would say that either. So we discussed the fact that he had pending charges, we discussed the fact that if he was found to be lying under oath that there could be perjury consequences. And that was the extent of any consequence that I'm aware of that he could face . . . .

Id. Mr. Orozco then decided to testify, as he felt "forced to" in the absence of any other witnesses. Id. at 1010; 6 Aplt. App. 1078; 7 Aplt. App. 1142.

The following morning, before he testified, Mr. Orozco told the court that when he and Mr. Ruiz-Salazar rode a van back to jail the previous day, Mr. Ruiz-Salazar recounted his conversation with Ms. Spradlin following her conversation with Ms. Morehead. 6 Aplt. App. 1075–76, 1078. According to Mr. Orozco, Ms. Morehead told Ms. Spradlin to tell Mr. Ruiz-Salazar that "if you get in my way, I'm going to get in your way," and therefore that Ms. Spradlin felt that Mr. Ruiz-Salazar should "step away from this case." 7 Aplt. App. 1140. The district court proceeded with the trial, but it agreed to hold a separate hearing to investigate Mr. Orozco's allegations. Id. at 1143. Mr. Orozco was convicted on both drug counts and acquitted on both firearm counts. 1 Aplt. App. 26–28.

Mr. Orozco subsequently filed a motion for a new trial, alleging that the government interfered with his right to a fair trial. See 6 Aplt. App. 1071. The district court held two hearings in which it heard testimony from Mr. Orozco, Mr. Ruiz-Salazar, and Ms. Spradlin. See 6 Aplt. App. 1071, 1106. The government presented no evidence, let alone from Ms. Morehead. Mr. Orozco reiterated that "the prosecutor told [Mr. Ruiz-

5

Salazar] if — if they get in her way, she will get in their way. So Ms. Spradlin told him just get away from this case, so he felt threatened and decided not to testify on my behalf." [1] Id. at 1078. Ms. Spradlin prepared an affidavit, which provided that "Ms. Morehead did advise me that Mr. Ruiz-Salazar could be charged with perjury should he testify," that "Ms. Morehead . . . was aware of Mr. Ruiz-Salazar's current indictment and which Western District AUSA was handling that indictment," but that she "[did] not recall all the specifics of [their] conversation in enough detail to state anything further." 7 Aplt. App. 1148.

Ms. Spradlin also testified under oath at the first hearing, and Mr. Campbell engaged in the following exchange with her on direct examination:

> Q. Ms. Spradlin, how — what was the tone of your conversation with Ms. Morehead?
> A. I — I don't really know how to put it, the tone.
> Q. Was it confrontational?
> A. I think it was assertive, I don't think I would say confrontational.
> Q. Was it made clear to you that Ms. Morehead was going to seek ramifications against your client if he testified in the matter?
> A. I don't think it was made clear. It was — it was just discussed that that was a strong possible outcome that could happen.
>                               * * *
> Q. How long did that conversation take?
> A. Five minutes or less.

6 Aplt. App. 1091–92. Ms. Spradlin also testified that she was not sure when Mr. Ruiz-Salazar decided not to testify. Id. at 1094.

---

[1] The government objected to Mr. Orozco's testimony as hearsay. In response, the district court explained that it would not "consider whatever Mr. Orozco testified to that Mr. Ruiz[-Salazar] said as being the truth in terms of what Mr. Ruiz[-Salazar] says, [it is] not going to consider that to be the truth but just to explain subsequent events that occurred." 6 Aplt. App. 1077–78.

On direct examination of Mr. Ruiz-Salazar, Mr. Campbell asked him if he "told Mr. Orozco that if you got in the prosecutor's way that the prosecutor would get in your — in your case," and whether he "[felt] threatened that if he were to testify in Mr. Orozco's case that it would impact his case," to which he responded "Yes." Id. at 1119–20. When asked what led to his decision not to testify, he responded, "Because the attorney and I talked that it wasn't the moment to testify." Id. at 1120–21. Mr. Campbell asked, "excluding anything [his] attorney told [him], was there anything else that made [him] change [his] mind?" to which he responded "No." Id. at 1121.

After the hearings, the district court granted Mr. Orozco's motion, finding that Ms. Morehead's statements to Ms. Spradlin "went far beyond a simple perjury warning." Orozco, 291 F. Supp. 3d at 1278. The district court acknowledged that the conversation was five minutes or less in duration, occurred outside the presence of Mr. Ruiz-Salazar, and that Ms. Morehead was assertive but not confrontational. Id. at 1277. However, it interpreted Ms. Morehead's warning that Mr. Ruiz-Salazar could face perjury charges "if he testified" as implying that the mere act of testifying would lead to adverse consequences. Id. at 1278. It also accepted as true Mr. Orozco's testimony that Ms. Morehead threatened to "get in [Mr. Ruiz-Salazar's] way" if he testified, and it found that her mentioning that she knew who was assigned to Mr. Ruiz-Salazar's case only added to the threatening nature of her comments. Id.

The district court also concluded not only that the "tone, content and import of [Ms.] Morehead's comments" established bad faith, but that other conduct also supported such a finding. Id. It cited her filing a sentencing information doubling the statutory

7

minimum on the morning that the jury was to be selected, her late disclosure of exculpatory evidence,[2] and a case over twenty years prior in which Ms. Morehead was accused of improper witness interference in securing a wrongful conviction. Id. at 1278–79, 1278 n.59. Next, it noted that even if Ms. Morehead merely advised Mr. Ruiz-Salazar of the consequences should he commit perjury, her comments were "unnecessarily strong," as they implied adverse consequences simply for testifying, and that there was no basis in the record to support the government's concern that Mr. Ruiz-Salazar would commit perjury. Id. at 1279. Finally, the district court found that, but for Ms. Morehead's intimidation, Mr. Ruiz-Salazar would have testified. Id. Thus, the district court concluded that Mr. Orozco's Sixth Amendment right to present a defense had been violated. Id. at 1281.

After reaching that finding, the district court turned to the remedy. It first determined that a new trial would not adequately remedy the violation because Mr. Ruiz-Salazar was still awaiting sentencing, and he would still have feared adverse consequences in his WDMO case. Id. at 1282 & n.86. In addition, the district court noted that he had been convicted of a felony in his WDMO case in the interim, and that he would now be subject to impeachment on that conviction. Id. at 1282. Accordingly, it

---

[2] The evidence consisted of over 200 pictures that Ms. Stimec-Smart testified were hers, 4 Aplt. App. 701–06, that were stored on a SIM card recovered from the pink nylon case. 2 Aplt. App. 110–12. The government argued that its late disclosure was inadvertent, as it learned only shortly before trial that the evidence had been stored as personal property rather than as evidence, and that the government had not believed it was material or exculpatory. 2 Aplt. App. 111–13. The district court continued the trial to give Mr. Orozco time to make use of the newly available evidence. Id. at 120.

vacated Mr. Orozco's convictions and dismissed the underlying counts in the superseding indictment with prejudice. Id. at 1283. The government timely appealed.

## Discussion

The government raises two issues on appeal. First, it argues that the district court clearly erred in finding that Mr. Orozco's Sixth Amendment right to a defense was violated by Ms. Morehead's conduct and Mr. Ruiz-Salazar's subsequent refusal to testify. Aplt. Br. at 27–47. Second, it argues that the district court abused its discretion by dismissing the indictment with prejudice rather than ordering a new trial. Id. at 48–56. We hold that the district court did not clearly err in finding that Mr. Orozco's Sixth Amendment right was violated, but we hold that the district court abused its discretion in dismissing the indictment with prejudice, thereby precluding a retrial.

Under Fed. R. Crim. P. 33(a), the district court may vacate a judgment and grant a new trial "if the interest of justice so requires." We review such decisions for abuse of discretion. United States v. Durham, 902 F.3d 1180, 1226 (10th Cir. 2018). A trial court abuses its discretion if its decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Jordan, 806 F.3d 1244, 1252 (10th Cir. 2015) (quoting United States v. McCullough, 457 F.3d 1150, 1167 (10th Cir. 2006)). In reviewing for abuse of discretion, we review legal conclusions de novo and factual findings for clear error. Jordan, 806 F.3d at 1252. Factual findings can be found clearly erroneous if "they have no basis in the record," id., or if this court "is left with the definite and firm conviction that a mistake has been committed." United States v. Lopez, 372 F.3d 1207,

1210 (10th Cir. 2004) (quoting United States v. Colonna, 360 F.3d 1169, 1175 (10th Cir. 2004)). Under these standards, we cannot conclude the district court clearly erred in finding that Mr. Orozco's Sixth Amendment rights were violated, nor can we conclude that the district court abused its discretion in granting Mr. Orozco's motion for a new trial and in vacating his convictions. Although the government argues that the district court relied upon a mistaken premise (that the government did not deny the occurrence or content of Ms. Morehead's comments to Ms. Spradlin), a review of the entire opinion makes it clear that the district court understood that the characterization was disputed and expressly rejected the government's position. Orozco, 291 F. Supp. 3d at 1277–78. Nor can we can conclude that the Sixth Amendment error was harmless beyond a reasonable doubt, notwithstanding the abundant evidence against Mr. Orozco, including his confession.

We hold, however, that the district court abused its discretion in dismissing the superseding indictment with prejudice rather than ordering a new trial. As with decisions to grant a new trial, we review a district court's dismissal of an indictment for abuse of discretion. United States v. Bergman, 848 F.3d 928, 931 (10th Cir. 2017). Importantly, remedies for Sixth Amendment violations should be "tailored" and not "unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364 (1981). Even more importantly, dismissal is "an extraordinary remedy" and is only used in cases of serious and flagrant prosecutorial misconduct. United States v. Apodaca, 820 F.2d 348, 349 (10th Cir. 1987). Because it is an extraordinary remedy, a district court may

10

only dismiss an indictment when the defendant has been prejudiced.  United States v. Villa-Chaparro, 115 F.3d 797, 804 (10th Cir. 1997).

Despite the district court's recognition that dismissing an indictment is an extreme remedy, Orozco, 291 F. Supp. 3d at 1281, it nevertheless dismissed the indictment with prejudice after finding that "a new trial would not be an adequate remedy."  Id. at 1282.  This decision failed to balance the competing interests that Morrison requires and failed to consider more narrowly tailored remedies.

We observe that less drastic remedies were available to address the district court's concerns.  The district court feared that Mr. Ruiz-Salazar felt that his testifying might subject him to adverse consequences in his WDMO case.  Orozco, 291 F. Supp. 3d at 1282.  To address this concern, the district court could have delayed Mr. Orozco's trial until after Mr. Ruiz-Salazar was sentenced in his WDMO case.  At the time the district court dismissed the indictment, Mr. Ruiz-Salazar was scheduled to be sentenced only two months later.  See Docket Sheet, United States v. Ruiz-Salazar, No. 15-cr-06004-DGK-7 (W.D. Mo. Oct. 31, 2017), ECF No. 618.  Although we would not require district courts to defer to other districts for scheduling matters, cf. Garza v. Davis, 596 F.3d 1198, 1205 (10th Cir. 2010) (district courts are afforded "great discretion" regarding control of the docket and parties), the district court should have considered this more tailored option before resorting to such an extraordinary remedy.

The district court also noted that even if Mr. Ruiz-Salazar was willing to testify at retrial, he was subsequently convicted in the WDMO case, and he would therefore be subject to impeachment under Fed. R. Evid. 609(a)(1)(A).  Id.  Again, however, the

11

district court could have pursued a more tailored and less drastic remedy by prohibiting the government from impeaching Mr. Ruiz-Salazar using his recent conviction.[3]  Each of these remedies would have mitigated any harms produced by Ruiz-Salazar's decision not to testify in the first trial, and they would not have infringed unnecessarily on the government's interest in prosecuting criminal behavior.

The district court also found that Ms. Morehead acted in bad faith, Orozco, 291 F. Supp. 3d at 1278–79, and it justified dismissing the indictment as a means through which to deter such conduct.  See id. at 1281–83.  While we recognize that a district court is often better positioned to determine whether a litigant has acted in bad faith, and it has the discretion to sanction litigants as it sees fit, the district court failed to tailor its remedy to the violation it found.  The bad faith conduct found by the district court did not justify imposing a remedy that failed to "preserv[e] society's interest in the administration of criminal justice."  Morrison, 449 U.S. at 364; cf. United States v. Gonzales, 164 F.3d 1285, 1292–93 (10th Cir. 1999) (agreeing with the district court's finding that the government's conduct was the product of flagrant bad faith but concluding that the district court nevertheless abused its discretion in imposing the most severe available sanction for discovery violations).  The district court never addressed why more narrowly tailored sanctions would not have provided a sufficient deterrent effect, and we therefore

---

[3]  Rule 609 provides that such a conviction "must be admitted subject to rule 403."  Fed. R. Evid. 609(a)(1)(A) (emphasis added).  Rule 403 in turn allows for exclusion of evidence if its probative value is substantially outweighed by the danger of, inter alia, unfair prejudice.  Fed. R. Evid. 403.  The district court thus could have excluded Ruiz-Salazar's subsequent conviction under the Rules based on any unfair prejudice to Mr. Orozco resulting from the change in circumstances.

12

conclude that the government should be permitted to retry Mr. Orozco. On remand, the district court should endeavor to tailor any restrictions on the government to curing the Sixth Amendment violation.

The dissent contends that the district court should be allowed to consider the remedy of dismissal with prejudice based upon flagrant misconduct. We are convinced, however, that dismissing the indictment with prejudice would be an abuse of discretion. The prejudice resulting from Mr. Ruiz-Salazar's decision not to testify must be placed in context. At best, Mr. Ruiz-Salazar's testimony would impeach Mr. Ruiz on a collateral matter — namely, that Mr. Ruiz-Salazar, not Mr. Ruiz, sold Mr. Orozco the chameleon-colored Camaro. Mr. Ruiz-Salazar was not going to contradict any of Mr. Ruiz's testimony that Mr. Ruiz had sold or given Mr. Orozco methamphetamine for resale on multiple occasions. Mr. Ruiz-Salazar's testimony would have been entirely excludable. See United States v. Walker, 930 F.2d 789, 791–92 (10th Cir. 1991). Moreover, substantial other evidence incriminated Mr. Orozco, including the Eastlands' testimony that they bought user quantities (and occasionally larger quantities) of methamphetamine from Mr. Orozco. This circuit has in the past concluded that employing the most extreme remedy to cure a violation is an abuse of discretion and then remanded for the district court to select among less extreme alternatives. See, e.g., United States v. Gonzales, 164 F.3d 1285, 1292–93 (10th Cir. 1999) ("[W]e find it necessary to remand to the district court for consideration of less severe sanctions."). We also note that the cases relied upon by the dissent (which concern grand jury proceedings), United States v. Pino, 708 F.2d 530, 531 (10th Cir. 1983), and United States v. Apodaca, 820 F.2d 348, 349 (10th

13

Cir. 1987), each considered the degree of any impairment of the constitutional function of the proceedings and rejected dismissal.

AFFIRMED in part, REVERSED in part, and REMANDED.

18-3003, United States v. Orozco

**LUCERO**, J., concurring in part and dissenting in part.

My esteemed colleagues and I are constant in our view that the district court neither erred in finding a violation of Orozco's Sixth Amendment right to present a defense, nor abused its discretion in vacating his conviction and granting his motion for a new trial. Further, we agree that the district court failed to conduct the proper balancing analysis required by United States v. Morrison, 449 U.S. 361, 364 (1981), in deciding to dismiss the indictment with prejudice. We agree that we must remand to require the district court to conduct the balancing analysis.

Given such agreement, why do I dissent? Separating us is what I consider to be the majority's impermissible decision to limit the remedies available to the district court to correct the Sixth Amendment violation on remand. Guiding authorities, clearly established by the Supreme Court and our circuit, provide that dismissing the indictment with prejudice is an allowable remedy for appropriate cases of flagrant prosecutorial misconduct. My colleagues leave the district court free to pursue remedies it finds appropriate to correct the Sixth Amendment violation except for dismissing the indictment with prejudice. In doing so, the majority goes farther than allowed by precedent. I dissent from this limitation on the remedies the district court may consider on remand, and would allow the district court the discretion to impose any remedy it finds necessary after conducting the Morrison balancing analysis and our circuit's seriousness analysis under United States v. Apodaca. 820 F.2d 348, 349 (10th Cir. 1987). This omission is, after all, why we are reversing.

# I

Morrison does not proscribe the discretion of trial courts, it merely prescribes that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests," including "society's interest in the administration of justice." 449 U.S. at 364. Accordingly, in selecting a remedy for a Sixth Amendment violation, courts must "identify and neutralize the taint [of the violation] by tailoring relief appropriate in the circumstances." Id. at 365. Consistent with this standard, our court has described dismissal of an indictment with prejudice as "an extraordinary remedy, generally reserved for serious cases of prosecutorial misconduct." Apodaca, 820 F.2d at 349; see also United States v. Pino, 708 F.2d 523, 530 (10th Cir. 1983) ("The remedy of dismissal of an indictment with prejudice on [prosecutorial misconduct] grounds is an extraordinary one.").

I agree with the majority that the district court did not adequately consider more narrowly tailored remedies and did not balance the need to remedy the constitutional violation with competing social interests as required by Morrison. 449 U.S. at 364. So far, so good. But then, usurping the district court's discretion, the majority jumps to the conclusion that dismissal with prejudice as a remedy is precluded as a matter of law. This leap is unacceptable.

# II

Unlike the majority, I would not preclude the district court from dismissing the indictment with prejudice. We generally review a district court's dismissal of an

2

indictment for abuse of discretion. United States v. Bergman, 848 F.3d 928, 931 (10th Cir. 2017). In my view, it is premature to hold as a matter of law that the district court will have abused its discretion should it dismiss the indictment with prejudice after complying with Morrison balancing and our circuit's seriousness analysis under Apodaca. 820 F.2d at 349.

We ordinarily decline to decide a matter in the first instance if that matter is committed to the sound discretion of the trial court. See Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1248 (10th Cir. 2008). "[T]o do so would overstep the bounds of our review for abuse of discretion and enter the realm of de novo review." Fox v. Maulding, 16 F.3d 1079, 1082 (10th Cir. 1994). Although we may make such initial determinations in some instances, see Orner v. Shalala, 30 F.3d 1307, 1310 (10th Cir. 1994), this case does not require us to depart from the general rule. Having observed the trial, and the conduct of the prosecutor in this case, the district court is uniquely situated to conduct the proper balancing under Morrison. 449 U.S. at 364; see generally Davoll v. Webb, 194 F.3d 1116, 1146 (10th Cir. 1999) (noting that the trial court "is in the best position to determine the facts of the case, to appreciate the consequences of alternative methods of resolving the issues of the case and [] is in the best position to select the most efficient method for their resolution" (quotation omitted)).

Our circuit recognizes that "flagrant misconduct" may warrant dismissal of an indictment with prejudice if necessary "to insure proper standards of conduct by the prosecution." Pino, 708 F.3d at 530, 531; see also Apodaca, 820 F.2d at 349 (stating that dismissal of an indictment is "reserved for cases of serious prosecutorial misconduct").

3

We were not persuaded in those cases that such a remedy was necessary, but we clearly contemplated that there can be prosecutorial misconduct flagrant and serious enough to warrant dismissal with prejudice.

I would allow the district court on remand to determine if the prosecutor's conduct in this case amounts to such flagrant misconduct. The majority does not purport to disturb the district court's findings of prejudice to defendant, or bad faith on the part of the prosecutor. Intimidating a witness to dissuade him from testifying through improper means can result in criminal sanctions. See 18 U.S.C. § 1512(b)(2)(A) (making it a crime to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person . . . with intent to . . . cause or induce any person to . . . withhold testimony"); U.S.S.G. § 3C1.1 & app. n.4(A) (imposing a sentencing enhancement for "threatening, intimidating, or otherwise unlawfully influencing a . . . witness"). My colleagues do not delve into the flagrancy or seriousness of the misconduct. Properly, that should be left to the district court.

As the Supreme Court has explained, a federal prosecutor

is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

4

Berger v. United States, 295 U.S. 78, 88 (1935).  In weighing the remedy necessary to resolve the constitutional violation present in this case, we must keep in mind those heightened duties.  Because this court does not have the benefit of the district court's analysis on the degree of flagrancy present and the factors laid out by the Supreme Court in Morrison, 449 U.S. at 364, I would reverse and remand without limitations on the remedies the district court may consider.