FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 19, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

NICK L. MEDEIROS; BOBBY
GREAVES,

    Defendants - Appellees.

No. 23-2019
(D.C. No. 1:18-CR-01966-JCH-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT***
_____

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

In this government contracting case, a jury convicted Nick Medeiros and Bobby

Greaves of conspiracy to defraud the United States (Count 1), major fraud against the

United States (Count 2), false statements to the Air Force (Count 3), and false statements

to the Department of Veterans Affairs ("VA") (Count 4). The district court granted a

motion to acquit on the substantive counts (Counts 2, 3, and 4), and it granted a motion

for a new trial on the conspiracy count (Count 1).

_____

* This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

On appeal, the Government does not challenge the acquittals. It argues the district court abused its discretion in granting a new trial on the conspiracy count. We disagree. The district court did not abuse its discretion in ordering a new trial because the acquittals on the substantive counts sufficiently called into question the weight of the evidence on the conspiracy count.

Exercising jurisdiction under 18 U.S.C. § 3731, we affirm.

## I.  BACKGROUND

### A. *Factual Background*[1]

**1. Government Contracts for Service-Disabled Veterans**

The federal government gives contracting preference to small businesses owned and controlled by service-disabled veterans.[2] Under this program, "set-aside" contracts may be awarded to eligible service-disabled veteran-owned small businesses ("SDVOSBs"). During the time period relevant to this case, an SDVOSB could establish its eligibility for set-aside contracts in one of two ways.

First, to establish eligibility for VA contracts, a business needed to be certified as an SDVOSB by the VA's Center for Verification and Evaluation ("CVE"). To obtain

---

[1] This factual summary derives from the evidence presented at trial.

[2] The contracting preference program for service-disabled veterans originated in laws enacted by Congress in the late 1990s and early 2000s. *See* Robert Jay Dilger & R. Corrinne Blackford, Cong. Rsch. Serv., R46906, *Service-Disabled Veteran-Owned Small Business Procurement Program* (2022). At trial, the Government presented uncontested evidence describing the program for SDVOSBs that was in place during the alleged conspiracy.

this certification, a service-disabled veteran needed to submit an application that demonstrated ownership and control over the business seeking certification. The CVE could verify statements in the application through further investigation, including on-site interviews.

Second, for contracts with other federal agencies, a business could self-certify that it qualified as an SDVOSB under Small Business Administration ("SBA") regulations.

2. **Mr. Medeiros's Business, NJM**

Mr. Medeiros was disabled during his military service. His brother-in-law, Mr. Greaves, helped him start a construction company, which Mr. Medeiros named NJM. Mr. Greaves and his wife had started their own construction company, JSR, about 10 years earlier. They gifted Mr. Medeiros 51 percent of the start-up capital for NJM, and Mr. Greaves held a 49 percent minority share. They also assisted in other ways, such as providing indemnification so that NJM could secure bonding.

Mr. Medeiros wanted to bid on SDVOSB contracts through NJM. He sought certification through CVE and also applied for self-certification contracts. To facilitate this process, Mr. Medeiros and NJM worked closely with Mr. Greaves and JSR. For example, Mr. Medeiros and Mr. Greaves had an oral leasing agreement under which Mr. Medeiros could lease employees from JSR at cost. *See* App., Vol. VII at 1156-58.

Between 2012 and 2016, NJM was awarded "eleven (11) contracts that required NJM to hold SDVOSB status." App., Vol. I at 93. Two of the contracts were self-certification contracts for Air Force projects: (1) the 2012 Cannon Air Force Base

Weapons Cleaning Room Contract ("Weapons Cleaning Room Contract") and (2) the 2013 Cannon Air Force Base Drop Zone Contract ("Drop Zone Contract"). The other nine were VA contracts that required CVE certification. Of the 11 contracts, only the Drop Zone Contract exceeded $1 million.

## B. *Procedural Background*

This case originated with a citizen tip to the CVE about "concerns that NJM was being used as an entity for the passthrough work to JSR." App., Vol. IV at 278. The CVE investigated, and a grand jury indicted Mr. Medeiros and Mr. Greaves.

### 1. **The Indictment**

The Government's charging theory was that Mr. Medeiros and Mr. Greaves concealed the extent of their working relationship and the relationship between NJM and JSR so that NJM could receive SDVOSB contracts. The superseding indictment charged Mr. Medeiros and Mr. Greaves with one count of conspiracy and three substantive counts related to specific alleged misrepresentations.

a. *Count 1: the conspiracy count*

Count 1 charged Mr. Medeiros and Mr. Greaves under 18 U.S.C. § 371, the federal conspiracy statute, which criminalizes conspiracy "to commit any offense against the United States, or to defraud the United States, or any agency thereof." The indictment charged the conspiracy in four sections: (1) scope, (2) objective, (3) manner and means, and (4) overt acts. *See* App., Vol. I at 94-99.

4

i. Scope

The indictment alleged that Mr. Medeiros and Mr. Greaves conspired to (1) defraud the United States; (2) commit major fraud against the United States through a scheme to obtain a contract worth $1,000,000 or more, in violation of 18 U.S.C. § 1031; (3) commit wire fraud, in violation of 18 U.S.C. § 1343; and (4) make materially false statements to the executive branch, in violation of 18 U.S.C. § 1001.  We refer to these as the four parts of the conspiracy.

ii. Objectives

The alleged "essential object of the conspiracy . . . was to obtain and maintain valuable SDVOSB contracts from the VA and [the Air Force, a branch of the] Department of Defense by misrepresenting the relationship between NJM and JSR, and by representing that particular employees and supervisors were NJM employees who were actually employed and paid by JSR."  App., Vol. I at 95.  "It was further an object of the conspiracy to conceal NJM's inability to provide sufficient employees and supervisors to complete contracts without JSR's assistance."  *Id.*

iii. Manner and means

The indictment alleged that Mr. Medeiros and Mr. Greaves "sought to accomplish the object[s] of the conspiracy" by submitting documents "represent[ing] . . . that NJM was able to perform significant portions of the awarded contract work without using JSR employees or equipment," while "NJM would actually use JSR employees to perform the . . . work" and "attempt to pass off JSR employees as its own."  *Id*. at 95-96.

iv.  Overt acts

The indictment also alleged nine overt acts committed during the conspiracy, each alleging that Mr. Medeiros, Mr. Greaves, or both made representations to the Air Force in contractual documents or to the VA during the CVE certification process.  *See id.* at 96-99.

- Overt Acts 1 and 6 concerned Mr. Medeiros and Mr. Greaves making statements in teaming agreements[3] submitted to the Air Force that NJM would be responsible for certain functions and provide employees for certain roles on the contract work.

- Overt Acts 2, 3, 4, and 7 related to Mr. Medeiros representing that JSR employees were actually NJM employees.

- Overt Acts 5 and 8 concerned representations Mr. Medeiros made in the CVE certification process about the relationship between NJM and JSR.

- Overt Act 9 consisted of Mr. Medeiros representing that NJM did work actually completed by JSR employees.

Three of the nine overt acts—1, 6, and 8—are particularly relevant to our analysis.  The indictment alleged:

> [1] On or about August 23, 2012, defendants [Mr.] Medeiros and [Mr.] Greaves signed a teaming agreement in pursuit of [the Weapons Cleaning Room Contract].  The teaming agreement stipulated NJM would be responsible for all contract management and supervisory functions, and would provide the project manager, contract administrator, quality control, safety manager, and superintendent for the contract. The teaming agreement was submitted to the U.S. Air Force

---

[3] A "teaming agreement" is a document explaining how two contractors propose to work together on a particular project.  *See* App., Vol. XI at 35 (teaming agreement for Weapons Cleaning Room Contract); App., Vol. XII at 93 (teaming agreement for Drop Zone Contract).

in which [Mr.] Medeiros signed as the "Prime," and [Mr.] Greaves] as the "Subcontractor." At the time, NM labor records indicated NJM had no employees in the state of New Mexico.

[6] On or about July 18, 2013, defendants [Mr.] Medeiros and [Mr.] Greaves signed a teaming agreement in pursuit of [the Drop Zone Contract] to construct the Drop Zone/Cyber Café at Cannon [Air Force Base]. The teaming agreement stipulated that NJM would be responsible for all contract management and supervisory functions, and would provide the project manager, contract administrator, quality control, safety manager, and superintendent for the contract. [Mr.] Medeiros signed as the "Prime," and [Mr.] Greaves as the "Subcontractor."

[8] On or about August 14, 2014, defendants [Mr.] Medeiros and [Mr.] Greaves represented to the VA that NJM and JSR do not share facilities, equipment, or employees through a signed memorandum that stated:

"We are located on the same property but do not share facilities, equipment or employees (I pay a service agreement to JSR, Inc., for administrative support as addressed earlier) . . . . NJM, Inc. has used JSR, Inc. as a subcontractor due to JSR Inc[.]'s competitive pricing on millwork, NJM's policy is to try and get at least three subcontractor quotes per discipline before making a decision about a subcontractor . . . . NJM, Inc. firmly stands alone and is NOT dependent on any other entity for its success."

*Id.* at 96-99 (capitalization altered without notation).

b. *Counts 2, 3, and 4: the substantive counts*

The indictment also charged Mr. Medeiros and Mr. Greaves with three substantive counts. Count 2 charged them with major fraud against the government "by means of false and fraudulent pretenses" to obtain the Drop Zone Contract, valued at $1 million or more, in violation of 18 U.S.C. § 1031. *Id.* at 99. It alleged Mr. Medeiros and

Mr. Greaves "falsely certif[ied] that NJM met SDVOSB and SBA standards for

independence and veteran control" in their application.  *Id.*

Counts 3 and 4 charged Mr. Medeiros and Mr. Greaves with making "materially

false, fictitious, and fraudulent statements and representations" to the government, in

violation of 18 U.S.C. § 1001(a).  *Id*. at 99-100.  Count 3 alleged they made materially

false statements to the Air Force to obtain the Drop Zone Contract by stating that "NJM

would provide [the] project manager, contract administrator, quality control, safety

manager, and superintendent," while "knowing . . . that statement to be untrue."  *Id*. at 99.

Count 4 alleged they made materially false statements to the VA by representing in a

memorandum "that NJM and JSR d[id] not share facilities, equipment, or employees,"

while "knowing . . . that statement to be untrue."  *Id.*

2.  **Trial and Initial Rule 29 Acquittal Motion**

At trial, the prosecution presented 11 witnesses, including the investigating agent

and experts in government contracting and SDVOSB regulations.  At the end of the

Government's case, Mr. Medeiros and Mr. Greaves moved under Federal Rule of

Criminal Procedure 29(a) for judgment of acquittal on all counts.  The district court

reserved ruling on the Rule 29 motion.

The defense then presented six witnesses, including Mr. Medeiros and

Mr. Greaves.  One witness, Elizabeth Connally, was an attorney hired by NJM to help it

obtain its CVE certification and bid on SDVOSB contracts.  The court instructed the jury

that Mr. Medeiros and Mr. Greaves's receipt of "advice from a lawyer" could be

considered "in deciding whether [they] acted willfully and with knowledge or with the intent to defraud." App., Vol. IX at 1477-78.

The district court also instructed the jury that to find Mr. Medeiros and Mr. Greaves guilty of conspiracy, it must "be convinced that the Government ha[d] proved . . . beyond a reasonable doubt . . . [that] one of the conspirators engaged in at least one overt act furthering the conspiracy's objective." *Id.* at 1464.

After less than three hours of deliberation, the jury found Mr. Medeiros and Mr. Greaves guilty on all counts. On Count 1, the conspiracy count, the special verdict form showed the jury unanimously found Mr. Medeiros and Mr. Greaves guilty on each of the four charged parts of the conspiracy. The form did not ask the jury to specify which overt act or acts the prosecution had proved.

After the jury returned its verdict, the court denied Mr. Medeiros and Mr. Greaves's Rule 29 motion.

3. **Renewed Rule 29 Acquittal Motion and Rule 33 Motion for a New Trial**

Four weeks later, Mr. Medeiros and Mr. Greaves timely renewed their Rule 29 motion for judgment of acquittal on all counts. They also moved under Rule 33 for a new trial on all counts "in the interest of justice." App., Vol. I at 238 (quoting Fed. R. Crim. P. 33(a)).

4. **District Court's Order**

The district court addressed the Rule 29 and Rule 33 motions in a single memorandum opinion and order.

a. *Rule 29 acquittals*

The first part of the district court's opinion addressed whether Mr. Medeiros and Mr. Greaves should be acquitted. The court granted the motion for acquittal on Counts 2, 3, and 4. But it denied the motion on Count 1, the conspiracy count, explaining that "the evidence, viewed in the Government's favor, was sufficient for a jury to conclude that there was an agreement between [Mr. Medeiros and Mr. Greaves] to defraud the federal government agencies . . . by concealing the true relationship that NJM had with JSR [from] the SBA and VA." App., Vol. II at 60.

b. *New trial*

The district court next addressed whether a new trial should be granted on Count 1. Although the court had acquitted on Counts 2, 3, and 4, Rule 29 also required it to determine whether a new trial would be appropriate on those counts if the acquittals were challenged and overturned on appeal.

The district court determined that (1) the weight of the evidence and (2) cumulative trial errors both supported ordering a new trial. *Id.* at 62-84. On the weight of the evidence, it credited Mr. Medeiros and Mr. Greaves's "credible defense as to reliance on the advice of counsel," *id.* at 62-63, and the weakness of the evidence supporting Counts 2, 3, and 4, *id.* at 63-66. It said, "This case is an exceptional one where the evidence weighs heavily against the verdict . . . ." *Id.* at 63. In its cumulative error analysis, the court found eight trial errors, *id.* at 66-83, which "viewed in the

10

aggregate, seriously affected the fairness of the trial as to all counts and warrant[ed] a new trial." *Id.* at 84.

On the conspiracy count, the district court ordered a new trial because "the verdict was against the weight of the evidence and influenced by cumulative prejudice arising from multiple trial errors." *Id.* at 23; *see also id.* at 62-63.

\* \* \* \*

The Government timely appealed. It challenges only the order granting a new trial. Aplt. Br. at 30 n.8. It does not challenge the district court's decision to acquit on Counts 2, 3, and 4.

## II. **DISCUSSION**

The acquittals on the substantive counts and Mr. Medeiros and Mr. Greaves's reliance on advice of counsel called the conspiracy conviction into question. We conclude the district court did not abuse its discretion when it ordered a new trial on the conspiracy count.

The following discussion addresses (A) our standard of review for a district court's decision to grant a new trial, (B) legal background on new trial orders and the federal conspiracy statute, and (C) an analysis of the relationship between the conspiracy count and the substantive-count acquittals.

### A. *Standard of Review*

We review a district court's decision to grant a new trial for abuse of discretion. *United States v. Orozco*, 916 F.3d 919, 924 (10th Cir. 2019). A district court "abuses its

11

discretion if its decision is arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.* (quotations omitted). We will reverse "only if the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *United States v. Zabriskie*, 415 F.3d 1139, 1144 (10th Cir. 2005). "This Court has ruled many times that the trial judge has broad discretion in deciding whether to grant a new trial, and the court's ruling on such a motion will not be disturbed on appeal unless there is a gross abuse of discretion." *United States v. Grigsby*, 272 Fed. App'x 738, 739 (10th Cir. 2008) (cited for persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1). Even when "the district court's reasoning [on the motion for a new trial] could have been more explicit, the district court d[oes] not abuse its discretion," as long as "we believe the district court weighed the evidence and considered the credibility of all the witnesses." *United States v. Garcia*, 182 F.3d 1165, 1170 (10th Cir. 1999).

## B. *Legal Background*

### 1. **Rule 33 Motion**

Federal Rule of Criminal Procedure 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "A motion for new trial should be granted if, after weighing the evidence and the credibility of the witnesses, the court determines that the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *Garcia*, 182 F.3d at 1170 (quotations omitted).

A district court may grant a Rule 33 motion even when the conviction is "supported with legally sufficient evidence" if it is "nevertheless against the weight of the evidence." *United States v. Fields*, 516 F.3d 923, 949 n.14 (10th Cir. 2008). Appellate courts seldom assume the role of the factfinder and reweigh the evidence in this situation. *See United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009) (noting that a "district court, which has viewed the trial evidence first-hand, may order a new trial when it perceives that the jury improperly weighed some of that evidence; but it would be a rare case in which an appellate court could make that kind of judgment"). "[T]he trial judge who presided at the trial of the case" and decided "the motion for a new trial[] ha[s] first-hand knowledge of the entire matter and is in a much better position than we, as an appellate court, to judge the merits of the motion." *United States v. Draper*, 762 F.2d 81, 83 (10th Cir. 1985).

2. **New Trials When Substantive and Conspiracy Counts Are Related**

When substantive convictions underlying a conspiracy count have been reversed or vacated, a new trial may be appropriate on the conspiracy count. *See United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007); *United States v. Wittig*, 575 F.3d 1085, 1098-1105 (10th Cir. 2009). In *Lake*, the defendants challenged their convictions for wire fraud, money laundering, circumvention of financial controls, and conspiracy. 472 F.3d at 1250. We reversed the substantive convictions and then held that "given the dependence of the conspiracy charges on the evidence and instructions regarding the substantive charges, we must also reverse the conspiracy convictions and remand for

13

retrial." *Id.* A new trial was necessary because "[t]he jury could not accurately evaluate the conspiracy allegations" without information at issue in the substantive counts. *Id*. at 1263.

### 3. **Conspiracy Under 18 U.S.C. § 371**

A conspiracy conviction under 18 U.S.C § 371 requires the Government to prove "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, (4) interdependence among the alleged conspirators," and (5) "an overt act in furtherance of the conspiracy." *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) (quotations omitted); *see also United States v. Wells*, 873 F.3d 1241, 1256 (10th Cir. 2017).

"[T]he purpose of the [overt] act must be to further the conspiracy." *United States v. Nall*, 949 F.2d 301, 305 (10th Cir. 1991). The act itself need not be unlawful, but it must be in furtherance of the specific conspiracy charged. *See Fiswick v. United States*, 329 U.S. 211, 216-17 (1946) (finding an act "adequate" as an overt act in furtherance of one conspiracy theory but not another). A coconspirator may be held liable for the overt acts of other coconspirators undertaken in furtherance of the conspiracy. *Wardell*, 591 F.3d at 1287, 1306 n.16.

The defendants must also "possess at least the degree of criminal intent necessary for the substantive offense that the parties are conspiring to commit." *Id.* at 1287.

C. *Analysis*

The district court's decision to order a new trial on the conspiracy count was not an abuse of discretion.  The overlap between the conspiracy count and the acquittal on the substantive-count acquittals lightened the weight of the evidence on conspiracy.  The acquittals also weakened the proof that certain overt acts furthered the conspiracy's objective.  We thus do not think "the [district] court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *Zabriskie*, 415 F.3d at 1144.  We therefore affirm.

1. **The Substantive-Count Acquittals and the Scope of the Conspiracy Count**

On appeal, the Government argues the acquittals on the substantive counts had only a "minimal impact on the body of conspiracy evidence" and the acquittal on those counts should have "no effect on Count 1's new-trial inquiry."  Aplt. Reply. Br. at 6; *see id.* at 6-11.[4]  We disagree.  Although the special verdict form shows the jury

---

[4] The Government's arguments on appeal mark a shift from their arguments in district court.  At the post-trial hearing on the renewed Rule 29 motion, the Government, when pressed for its conspiracy evidence, directed the court "first to Count 4 and Count 3," which it said concerned "untrue" "joint submissions" from Mr. Medeiros and Mr. Greaves.  App., Vol. VIII at 1420.  The Government further argued that Count 4 supported the conspiracy count because the evidence on Count 4 showed Mr. Medeiros and Mr. Greaves's "intent to mislead the Government." *Id.* at 1422.  During its closing argument, the Government again recognized that the evidence on Counts 2, 3, and 4 supported Count 1, referencing the "falsehood[s] and misrepresentation[s] made in order to maintain and obtain [SDVOSB] restrictive bidding contracts" including those "already talked about":  the "[f]alse statements" in Counts 3 and 4 and "major fraud" in Count 2.  App., Vol. IX. at 1531.

convicted on each part of the conspiracy alleged in Count 1, all four parts overlapped with the substantive counts.

The first part—that Mr. Medeiros and Mr. Greaves conspired to defraud the United States—encompassed making false statements to executive branch agencies. Counts 2, 3, and 4 charged Mr. Medeiros and Mr. Greaves with making false statements.

The second part—that Mr. Medeiros and Mr. Greaves conspired to "commit major fraud against the United States in violation of 18 U.S.C. § 1031," App., Vol. I. at 94—aligned with Count 2, which charged Mr. Medeiros and Mr. Greaves with major fraud in obtaining the Drop Zone Contract.[5]

The third part—that Mr. Medeiros and Mr. Greaves conspired to "commit wire fraud . . . for the purpose of executing a scheme and artifice to defraud the VA and the Air Force of money and property, and to obtain money and property by means of false and fraudulent pretenses," *id.* at 95—relied on Mr. Medeiros and Mr. Greaves having fraudulently obtained contracts, which was alleged in Counts 2, 3, and 4.[6]

---

[5] Major fraud under 18 U.S.C. § 1031 requires that the contract sought is worth more than $1,000,000. *See* 18 U.S.C. § 1031(a)(2). The Drop Zone Contract was the only SDVOSB contract awarded to NJM that was worth more than $1,000,000. *See* App., Vol. I at 93. Both the major fraud conspiracy allegation and the major fraud count thus relied on NJM's attempt to obtain the Drop Zone Contract.

[6] Counts 2 and 4 are most relevant. Count 2 addressed whether NJM fraudulently obtained the Air Force contracts by falsely certifying that it met SDVOSB and SBA standards for a self-certification contract. Count 4 addressed whether NJM fraudulently received VA contracts through a false representation in the CVE certification process.

The fourth part—that Mr. Medeiros and Mr. Greaves "ma[de] materially false statements and representations to the United States in order to influence a decision of the Executive Branch of the United States government, in violation of 18 United States Code, Section 1001," *id.* at 95—related to substantive Counts 3 and 4, which charged Mr. Medeiros and Mr. Greaves with specific false, fictitious, and fraudulent statements and representations in violation of 18 U.S.C. § 1001.

The substantive acquittals called into question the weight of the evidence on every part of the alleged conspiracy count. We thus cannot say the district court abused its discretion in ordering a new trial on the conspiracy count. *See Lake*, 472 F.3d at 1263.

2. **The Substantive Acquittals and Overt Acts in Furtherance of the Conspiracy's Objectives**

The substantive-count acquittals also affected the weight of the evidence on whether one or more of the alleged overt acts furthered the conspiracy's objectives.

The indictment alleged nine overt acts. It also alleged the "essential object of the conspiracy . . . was to obtain and maintain valuable SDVOSB contracts . . . by misrepresenting the relationship between NJM and JSR, and by representing that particular employees and supervisors were NJM employees who were actually employed and paid by JSR." App., Vol. I at 95. In short, the main conspiracy's objective was to obtain contracts by misrepresentation.

On the conspiracy count, the judge instructed that the jury must find "one of the conspirators engaged in at least one overt act furthering the conspiracy's objective." App., Vol. IX. at 1464; *see also Wardell*, 591 F.3d at 1287. Proving an overt act alone

17

would not meet the Government's burden.  It needed to prove (1) an overt act that (2) furthered (3) the conspiracy's objective.

As we explain below, the substantive-count acquittals weakened the evidentiary link between three overt acts and furtherance of the conspiracy's objective.[7]  And because the special verdict form did not tell us which overt act or acts the jury relied on to convict Mr. Medeiros and Mr. Greaves, the district court's order for a new trial on the conspiracy count was reasonable.

a.  *Overt Acts 1 and 6 - teaming agreement*

The Count 3 acquittal affected the weight of the evidence on whether Overt Acts 1 and 6 furthered the conspiracy's objectives.

Count 3 concerned the teaming agreement submitted in NJM's application for the Drop Zone Contract.  The agreement stated that NJM would "provide . . . the project manager, contract administrator, quality control/safety manager(s) . . . and superintendents."  App., Vol. XII at 100 (capitalization altered without notation).  The district court acquitted Mr. Medeiros and Mr. Greaves of Count 3 because "[t]he Government's evidence was insufficient for a reasonable jury to conclude that the Teaming Agreement was 'false' in the sense that it misrepresented the true relationship of

---

[7] In its closing argument at trial, the Government recognized the relationship between the substantive counts and the conspiracy overt acts.  The prosecutor argued Counts 2, 3, and 4 encompassed overt acts allegedly committed in furtherance of the conspiracy.  *See* App., Vol. IX at 1500.

NJM and JSR where the contractual language gave NJM so much discretion to utilize employees from other companies." App., Vol. II at 48; *see also id.* at 46-50.

Although Count 3 referred only to the teaming agreement submitted in the Drop Zone Contract application, the district court noted that Mr. Medeiros and Mr. Greaves "submitted essentially the same Teaming Agreement for both the Weapons Cleaning and the Drop Zone contracts to the [Air Force]." *Id.* at 65.[8] Thus, the evidence was also "insufficient for a reasonable jury to conclude" that the statement in the teaming agreement submitted with the Weapons Cleaning Room Contract application was false. *Id.* at 48.

Overt Act 1 alleged that Mr. Medeiros and Mr. Greaves signed NJM's application for the Weapons Cleaning Room Contract, and that the application included a teaming agreement stating "NJM would be responsible for all contract management and supervisory functions, and would provide the project manager, contract administrator, quality control, safety manager, and superintendent for the contract" despite "NJM hav[ing] no employees in the state of New Mexico" where it was operating. App., Vol. I at 96. Overt Act 6 alleged that Mr. Medeiros and Mr. Greaves signed a teaming agreement for NJM's Drop Zone Contract application containing the same language. *Id.* at 97-98.

---

[8] None of the substantive counts concerned the Weapons Cleaning Room Contract. But Overt Act 1 concerned the teaming agreement for the Weapons Cleaning Room Contract.

19

Count 3 and Overt Acts 1 and 6 all alleged that Mr. Medeiros and Mr. Greaves made statements in the teaming agreements about NJM's responsibilities for the Weapons Cleaning and Drop Zone Contracts.  Count 3 also alleged the statements were false.  The district court acquitted on Count 3 because the evidence was insufficient to prove that the teaming agreement statements were false.  It follows that even if the Government proved that Mr. Medeiros and Mr. Greaves made the statements alleged in Overt Acts 1 and 6, the court's acquittal of Count 3 vitiated the evidentiary basis to find that the overt acts furthered the conspiracy's "essential objective"—to obtain contracts by misrepresentation.

b.  *Overt Act 8 - "do not share"*

The Count 4 acquittal affected the weight of the evidence on whether Overt Act 8 furthered the conspiracy's objectives.

Count 4 charged Mr. Medeiros and Mr. Greaves with making a "materially false, fictitious, or fraudulent statement" by stating in a memorandum to the VA "that NJM and JSR did not share facilities, equipment, or employees." *Id.* at 99.  The district court found the evidence was insufficient for a reasonable jury to find the "do not share" statement was false.  *See* App., Vol. II at 28, 36-40.  It said Mr. Medeiros and Mr. Greaves could reasonably have interpreted the word "shared" to mean NJM and JSR did not share employees.  The court said that although the Government had presented evidence showing that Mr. Medeiros and Mr. Greaves "conceal[ed] information about

20

NJM's use of JSR employees," *id.* at 37, Count 4 was based on the alleged "*affirmative representation*" that NJM and JSR "did not share employees," *id.* at 39.

Similarly to Count 4, Overt Act 8 alleged that Mr. Medeiros and Mr. Greaves affirmatively "represented to the VA that NJM and JSR do not share facilities, equipment, or employees through a signed memorandum." App., Vol. I at 98. Count 4 also alleged the representation was false. The district court acquitted on Count 4 because it found the evidence insufficient to prove that Mr. Medeiros and Mr. Greaves believed the "do not share" statement was false. It again follows that even if the Government proved that Mr. Medeiros and Mr. Greaves made the statement alleged in Overt Act 8, the court's acquittal of Count 4 undermined the evidentiary basis to find that the overt act furthered the conspiracy's "essential objective"—to obtain contracts by misrepresentation.

Mr. Medeiros and Mr. Greaves's reliance on advice of counsel adds support to this conclusion. Attorney Connally "specifically advised Defendant Medeiros that NJM and JSR did not share facilities, equipment or employees based on the regulations . . . ." App., Vol. II at 63 (citing App., Vol. VII at 1095).[9] Her testimony showed that Mr. Medeiros and Mr. Greaves's statement to the VA that "NJM and JSR did not share

---

[9] At trial, Mr. Greaves's attorney asked Attorney Connally, "Is it fair to assume that your answers would all be the same with respect to Bobby Greaves?" App., Vol. VII at 1105-06. She answered, "Yes, sir," *id.* at 1106, showing that she advised both Mr. Medeiros and Mr. Greaves. The advice of counsel jury instruction concerned both Mr. Medeiros and Mr. Greaves. App., Vol. I at 216.

facilities, equipment, or employees" was "based off of information [and] advice from [her]." App., Vol. VII at 1095. Attorney Connally also "work[ed] closely" with Mr. Medeiros on his "CVE certification." *Id.* at 1094; *see also id.* at 1108-09. The district court credited this testimony to support its new trial order based on the weight of the evidence. *See* App., Vol. II at 63-66.

Evidence that Ms. Connally advised Mr. Medeiros and Mr. Greaves that NJM and JSR were not "sharing" employees shows that the "do not share" Overt Act 8 statement was not made to further the conspiracy's alleged objective to obtain contracts by misrepresentation.

\*     \*     \*     \*

Acquittals of substantive counts underlying a conspiracy count may call for a new trial on conspiracy. *See Lake*, 472 F.3d at 1250. Here, the substantive acquittals weakened the evidentiary support for each part of the conspiracy count. The acquittals also undercut proof that several overt acts furthered the conspiracy's objectives, and we do not know which overt acts the jury relied upon to convict on the conspiracy count. The district court's order for a new trial on conspiracy was reasonable.

## III.  CONCLUSION

The district court did not abuse its discretion in ordering a new trial on the conspiracy count against Mr. Medeiros and Mr. Greaves.  We affirm.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge